## THE CHELMSFORD.[1]

### MAYO *et al.* v. THE CHELMSFORD.

*(District Court, E. D. Pennsylvania. February 27, 1888.)*

1. MARITIME LIENS—SUPPLIES—HOME PORT.
   There is no implied maritime lien against a vessel for supplies furnished to her at her home port.
2. SAME.
   There is an implied maritime lien against a vessel for supplies furnished by one at the home port, at the owner's request, and shipped to the vessel elsewhere.
3. SAME—WAIVER—BY TAKING DRAFT.
   Taking a draft for supplies furnished to a vessel in a foreign port is not a surrender of the right to a lien for the same. The right to the lien is a security, and passes with a draft to the indorsee.
4. SAME—HOME PORT—WHAT CONSTITUTES.
   The home port of a vessel is where her owner has a *bona fide* residence, and this rule binds all who know where the owner resides, even though the vessel has a foreign register, and sails under a foreign flag.
5. COURTS—FEDERAL DISTRICT—PRACTICE—FOLLOWING SIMILAR DECISIONS.
   The decisions of other district courts in similar cases will be followed in order to secure uniformity, although those decisions do not seem to be based upon sound principles.

In Admiralty.
*Henry R. Edmunds* and *John C. Dodge & Sons*, for libelants.
*Driver & Coulston* and *Goodrich & Goodrich*, for respondent.

BUTLER, J. In the years 1882 and 1883, the libelants, ship-chandlers in Boston, furnished the respondent at various times, (the last being

[1] Reported by C. Berkely Taylor, Esq., of the Philadelphia bar.

in December, 1883,) with necessary supplies, at the instance of her owner, Mr. Warner, when in the port of Boston. In the months of October and November, 1883, they furnished her other supplies to the value of $694.45, at the owner's instance, forwarding them to Portland, where she then was. In June of the same year, Quimby & Co., of Bangor, Me., furnished the ship (then at that port) with supplies of the value of $215.26, taking therefor a draft drawn by the master in their favor on the owner. This draft was transferred by indorsement to the libelants, who cashed it for Quimby & Co. After crediting several payments made, there remains a balance due on the accounts of $3,467.02, with interest from December 6, 1883, to recover which the attachment was issued. In November, 1884, the claimant purchased the ship for $10,000, and took possession. Prior to the date when the indebtedness to libelants, or any part of it, was contracted, the purchaser had made advancements to the owner amounting to $9,700, or thereabout, and had taken a mortgage on the ship to secure payment. The consideration for the sale was this indebtedness, and an additional sum of $300. At the time libelant's claim arose, and for several years prior thereto, the home port of the vessel was Boston, and so continued until after her sale. The owner resided there, and still does. She was built at Quebec, was registered there, and started out with the British flag, which she continued to carry. The owner went from Boston, where he had been located for some time, to Quebec, to build her, and remained there until she was finished and started out to sea. Since then he has resided in Boston for a period of eight or more years. About this latter fact there does not seem to be room for reasonable doubt. Mr. Atwood, of the libelant firm, testifies distinctly, on cross-examination, that he had known him there for 10 years; that he was living with his nieces, where he spent nine months or more of each year. There is no evidence that he had any other home within this period. When not there he was with the vessel, or in pursuit of other business. His own testimony is singularly unsatisfactory and unreliable. He starts out with a statement that his memory is very defective, and that in consequence little dependence should be placed upon what he says. His testimony, on its face, fully supports this statement. I would infer that he is wanting in intelligence, and that he testifies under a strong bias in favor of the libelants. Much that he says is difficult to understand. I conclude from his entire statement that he was born in England, and came to this country when quite young, locating in New York, where he resided with one MacKay. While there (how long he remained is very uncertain) he married MacKay's sister-in-law. He then went to Boston, where he lived for some time; how long, is also uncertain. From there he moved to Quebec, and engaged in ship-building with MacKay, (who, I infer, had also moved there,) and continued in the business for some years. He withdrew from the partnership, and (his wife having died) visited England. After a time he returned to this country, and again located in Boston. Subsequently he went to Quebec to build the vessel in question, remaining only so long as was necessary to complete the work and start her to sea,—a period of three

or four months. He left Quebec with her, (or directly after,) visited England, France, and other places, and finally returned to Boston with the ship, where he has continued to reside ever since, being absent occasionally on business, probably as much as three months of the year. After his return to Boston, which occurred eight to ten years ago, he became part owner of several Boston vessels, and entered into numerous shipping enterprises. In some of these vessels, and in one or more of the enterprises, the libelants were interested with him; and, in addition thereto, he and they had considerable business intercourse. In the registration, mortgage, and bill of sale of the ship, the owner stated his residence as Boston. There cannot, therefore, I repeat, be reasonable doubt that the owner's home was Boston, at the time in question. This fact determines the home port of the vessel. See *The E. A. Barnard*, 2 Fed. Rep. 712; *The Mary Morgan*, 28 Fed. Rep. 333.

Were the libelants misled respecting the owner's residence? This question has received careful attention. I have, however, not found anything to justify an affirmative answer. It must be borne in mind that the misleading, to be material, must have been in respect to this fact—the owner's residence. The testimony of Mr. Atwood, of the libelant firm, shows that they were not so misled. They knew that he had lived in Boston for many years, and were bound to know that this constituted Boston his place of residence. If they had not known this, and his residence had been difficult of ascertainment and doubtful, the foreign registration and foreign flag might be appealed to as evidence on that point. As the residence, however, was known, they are unimportant. To one ignorant of the law they might mislead respecting the home port of the vessel, but the libelants cannot plead ignorance. Knowing that Warner resided in Boston, (or having the means within reach of ascertaining this fact even,) they were bound to know that the home port of the vessel was there. It follows that no implied lien can exist for the supplies furnished in Boston.

It is urged, however, that the evidence shows an express lien. Aside from the question (raised and discussed) whether such a lien could be created by parol, it is sufficient to say that I find no evidence of an express contract for a lien. Without such contract no express lien can exist. It is plain that there was no such contract. The libelant's evidence shows that the subject was never alluded to by the parties. Mr. Atwood says the libelants charged the ship, intending to look to her; and that he believed that Warner so understood; though nothing was ever said between them on the subject. This is the ordinary foundation for an implied lien, where one may exist, nothing more. It has no tendency, even, to support the allegation of an express lien.

For the debt represented by the draft given Quimby & Co., there was a lien. The supplies were necessary, and were furnished in a foreign port, at the master's instance. Taking the draft did not affect the lien. The transfer of the indebtedness, transferred the lien. The latter was security simply for the debt, and as in all other instances it follows the debt to the transferee.

v.34 f. no.5—26

As respects the claim for supplies furnished in Boston, at the owner's instance,—$694.45,—and forwarded to the vessel at Portland, I should have no hesitation in disallowing it, in the absence of authority on the subject. I am unable to understand how an implied lien can be sustained, consistently with the principles governing such liens, under the circumstances. Supplies furnished at the home port are presumed to be furnished on the credit of the owner; and the presumption is conclusive, in the absence of a contract for an express lien. How and why it should make any difference that the supplies so furnished are forwarded to the vessel elsewhere, by the owner's direction, I am unable to comprehend. Why does not the presumption that the owner's credit is relied upon, in the latter case, arise as clearly and as strongly as in the former? Furthermore, why should not the merchant be regarded as the owner's agent in forwarding the supplies purchased. I find, however, that the precise question has been decided the other way, in *The Sarah J. Weed*, 2 Low. 555; *The Agnes Barton*, 26 Fed. Rep. 542; and *The Huron*, 29 Fed. Rep. 183. It seems probable that the same question was involved and so decided in *The Union Express*, Brown, Adm. 537, and *The Hiram R. Dixon*, 33 Fed. Rep. 297, also, though the reports of the latter two cases are not sufficiently perfect to render this certain. In neither of the cases is the subject discussed at any length, or any adequate reason assigned, in my judgment, for the conclusion reached. So great, however, is the importance I attach to uniformity of decision, by courts of co-ordinate jurisdiction, that I feel constrained to adopt the rule thus established in the several districts in which these cases arose. It seems more important that the rule should be uniform and certain than that it should be consistent with principle. This claim is therefore allowed. A decree will be entered in the libelants' favor for the two sums indicated, amounting together, with interest, to $1,163.96, with costs.