## SHOSHONI LUMBER CO. v. FIDELITY & DEPOSIT CO. OF MARYLAND, ET AL

(No. 1801; August 29, 1933; 24 Pac. (2d) 690)

For the defendant and appellant there was a brief by *Kinkead & Pearson* of Cheyenne, Wyoming, and *Thomas A. Mapes* of Denver, Colorado, and oral argument by *Mr. A. A. Pearson*.

For the plaintiff and respondent there was a brief and oral argument by *Donald Spiker,* of Riverton, *Bryant S. Cromer* of Casper, and *A. H. Maxwell* of Lander, Wyoming.

There was a brief as Amicus Curiae and oral argument by *Mr. M. A. Kline* of Cheyenne, and one in reply to plaintiff and respondent Shoshoni Lumber Company, and *M A. Kline*, Amicus Curiae, by

*Kinkead & Pearson,* and *Thomas A. Mapes* for defendant and appellant.

*Kinkead & Pearson* of Cheyenne and *Thomas A. Mapes* of Denver, Colorado, in reply to respondent and amicus curiae.

RINER, Justice.

This case comes before the court upon direct appeal from a judgment of the District Court of Natrona County in favor of Shoshoni Lumber Company, plaintiff and respondent, for convenience subsequently referred to as the "plaintiff," and against both the Fidelity and Deposit Company of Maryland, defendant below, appellant here, and generally hereinafter mentioned as the "surety," and James F. Turpen, defendant below, respondent here, who may appropriately be designated as the "contractor."

The litigation was commenced by the plaintiff in Fremont County and, after the issues were framed, was removed on application of the surety to Natrona County where the trial thereof was had and the judgment aforesaid was rendered.

On July 2, 1929, the State of Wyoming, through the State Highway Commission, entered into two contracts with the said Turpen. These instruments provided that he should "do all work and furnish all labor, materials, tools" necessary to properly complete, under the one contract, the "concrete work, iron pipe railing and painting structural steel for a 450 foot bridge over Wind River on the Riverton Shoshoni road," and under the other, the "structural steel for a 250 foot steel truss" needed as a part of said bridge. Several days thereafter, as required by law, the contractor, with appellant surety thereon, executed two bonds to the State for its use and "also for the use and benefit of all persons who may perform any work or labor or furnish any material in the execution" of said con-

tracts, the condition of each of said bonds being, in part, that if the said Turpen should "pay as they become due and payable, all just claims for work or labor performed and material furnished in the execution" of each contract, then the obligation should be void, otherwise it should be "in full force and effect." The bond on the steel contract was given for the sum of $28,900, and that relating to the substructure agreement was for the sum of $35,-600. Work was begun on the bridge about the 15th of July, 1929, the steel contract being completed in April, 1930, and the substructure contract in the month of June following. It was pleaded by the plaintiff and the court found as a fact that the two contracts were "in effect, for the construction of the bridge as an integral undertaking," as Turpen, under them, appears to have built the entire proposed structure.

The contractor failed to pay certain claims for labor and material furnished in the execution of these contracts, and the plaintiff, both on its own behalf and as assignee of sundry other unpaid claimants, brought suit against him and his surety on the bonds aforesaid, to recover the several amounts claimed to be due. After plaintiff's original petition, consisting of fifteen alleged causes of action, had been filed, the court, on motion of the surety, required the pleading to be recast so as to show under which of the contracts above mentioned the various items of labor and materials, for which recovery was sought in said petition were furnished. Ultimately, a second amended petition was filed by plaintiff wherein it was, at the outset, stated in substance that plaintiff could not, at that time, safely comply with the court's order and, hence, pleaded each claim as a cause of action under each bond. A demurrer, for the most part general in

character, interposed by the surety to this pleading, was overruled and both defendants filed answers, in substance, general denials. Upon the trial, neither the surety nor the contractor introduced any evidence whatsoever, to sustain the issues in their behalf and the contractor, himself, was called and testified as a witness for the plaintiff. He not only attested the correctness of plaintiff's several claims, as labor and material duly furnished him in the execution of the contracts aforesaid, but indicated to which of these contracts the various items of said claims were properly allocated.

The judgment, of which complaint is made, found generally in favor of the plaintiff and against each of the defendants. It also specifically found and separately stated the amounts due on each claim and to which contract the several items thereof so found due were chargeable. The total amount, including interest, awarded plaintiff by the judgment was the sum of $2,789.07.

The contractor filed no brief in this court, the attack on the judgment being maintained by the surety alone. Upon due application, permission was granted *Marion A. Kline,* as counsel for other parties interested in questions existing in pending litigation rather similar to some of those presented in this case, to file a brief herein as amicus curiae, to which the surety has filed its response.

It is first insisted that plaintiff's second amended petition fails to state a cause of action relative to any of the fifteen claims relied on therein, because it is said that, inasmuch as plaintiff has pleaded each of its claims as recoverable under each of the two bonds and, as this cannot be so in fact, no recovery at all can be had under the pleading. In substance, it is contended that each cause of action should have been pleaded so as to exactly show

what the proofs given upon the trial ultimately did.

But, as will be recalled from what has been stated above, plaintiff expressly declared in its pleading that it could not safely do this, and it is apparent from the evidence in the case, as well, that it did not obtain accurate information concerning the matter until long after its second amended petition was filed. The contractor at all times possessed this knowledge. He was aligned with the surety as a defendant in the case. Inasmuch as the contract of suretyship imports entire good faith and confidence between the parties thereto relative to the whole transaction, it would seem that the surety itself could have obtained the desired information as to just what items of labor and material were used in the execution of each of the contracts, much more readily and easily than either the plaintiff or its assignors. Suppose, as is suggested by appellant, the plaintiff or its assignors had inquired, at the time the labor was rendered or the materials furnished, concerning the execution of which contract they were to be applied, and they had obtained, for one reason or another, inaccurate information. Appellant's argument leads to the result that they then should lose the value of their labor and materials. We cannot think that this should be so.

The contention is not made here for the surety that the labor and materials did not enter into the execution of the contracts involved or that the amounts of the several bonds have been exceeded by the surety's payment on account of such claims or would be exceeded if the instant judgment were allowed to stand. In view of the circumstances shown in this case relative to this phase of the matter, we fail to see how the surety has been in any

way prejudiced by the judgment under review. As has been mentioned, the judgment itself segregates to the several contracts the various items of labor and material of the claims adjudicated, and the surety appears, consequently, to have been afforded the information and protection it desired. But one recovery was permitted on each of the fifteen claims, although thirty causes of action, fifteen on each of the bonds, were pleaded. There is nothing amiss that we can perceive in allowing plaintiff, under the circumstances shown in this case, to adopt the method of pleading it did. Among others, the following authorities afford material assistance in reaching the conclusion indicated:

In 1 Bates' New Pleading (1925 Ed.) 479, it is said:

"Nevertheless, the overwhelming weight of authority is that wherever there is a fair doubt, whether pleading in one mode only would be safe (and plaintiff must almost necessarily be the judge of this for himself), or if plaintiff is uncertain as to the grounds of his recovery, he may state his cause of action in as many ways as is necessary to meet possible states of the proof."

In First National Bank v. C. N. B. & T. P. Ry. Co., 9 Oh. Dec. (Repr.) 702, it was held that, where the same transaction gave rise to one cause of action or another according to the existence or nonexistence of facts primarily within the knowledge of the defendant, the plaintiff could set them out in separate causes of action and recover on either, and that he could not be required to elect when by direct averment or from the nature of the case it was apparent that he could not safely determine before the development of the trial, which would prove to have been the true situation. In the course of reaching these conclusions, the court remarked:

"It is a cardinal principle of the law to avoid multiplicity of actions, while the code is the avowed enemy of useless form and circuity. Abolishing all forms and fictions it simply requires that the petition shall 'contain a statement of the facts constituting the cause of action (or causes, read in connection with sec. 5019) in ordinary and concise language, (sec. 5060). And where the plaintiff states exactly what took place, and then states that he does not know, or it is apparent from the nature of the case that he cannot know with certainty whether or not a fact existed upon which depends, not whether one transaction or another is to be the subject of enquiry at the trial, but what the nature of his right will prove to be, and that fact too is one necessarily known to the defendant, upon what principle is he to be told that he has violated either the letter or the spirit of the code or any rule of law underlying it? His ignorance of the exact nature of the transaction on the part of the defendant is just as much one of the facts of his case as that he dealt with the defendant at all. Why is he to be forbidden to state it if he does state under oath that he believes it to have been what it apparently was, but if it prove not so, then it was another, when in either case defendant is liable?"

So it is said in 1 C. J. 1076, relative to the rule of consistency in pleading causes of action, that:

"In applying the rule a distinction is also to be observed between cases where the complaint states distinct causes which are so inherently repugnant and contradictory that the assertion of one necessarily constitutes an election and precludes an assertion of the other, and cases * * * where, if the complaint be regarded as in fact stating different causes of action, only one recovery is sought and the causes are so stated because of an uncertainty as to which of them the evidence may establish, or it may appear that plaintiff is entitled to recover on. In cases of the latter character, and particularly where the matters as to which plaintiff is uncertain are peculiarly within the knowledge of de-

fendant, plaintiff may, without the complaint being objectionable for inconsistency, set up in the form of different causes of action his different grounds or theories, although there may be some inconsistency as to the facts alleged."

In Globe Indemnity Co. v. Wassman, 120 Oh. St. 72, 165 N. E. 579, 584, discussing the subject of inconsistent causes of action, under the code in that state, it is pointed out that

"It frequently happens that a plaintiff seeking recovery upon a transaction may not know which of two grounds he will be able to prove in order to sustain his cause of action, and often may have grave doubts as to his ability to safely plead and prove the one or the other. Under our code of liberal procedure, where there is uncertainty as to the exact ground of recovery, a plaintiff, where but one satisfaction is sought, may so frame his petition as to meet the contingencies of the trial. Where he is uncertain which of two grounds he may be able to prove in order to fix liability on the part of a defendant, and is uncertain as to which of the two he can safely plead, he should not be required to elect upon which of the two grounds he will stand." (Citing cases)

Similarly, in Astin v. Chicago, M. & St. P. R. Co., 143 Wis. 477, 128 N. W. 265, 270, 31 L. R. A. (N. S.) 158, the court, referring to two of its earlier decisions, said:

"In each there were two or more causes of action contemplating only a single satisfaction for a single wrong, it being evident that the pleader stated his case in the double aspect because of not knowing, satisfactorily, upon what precise theory the evidence might entitle him to redress.

"In both cases it was claimed that the causes of action were not joinable, because inconsistent

with each other  In the first error was assigned because plaintiff was not required to choose one of the theories presented, and abandon the rest.  This court said, in effect: It might be difficult to tell in advance precisely upon what theory of the situation the loss claimed was recoverable.  Of course, plaintiff was entitled to recover on whichever of the two theories of right thereto the evidence might warrant.  In general, the Code requires a plaintiff to take a stand upon the cause of action he expects to recover on.  But it is not always possible for a party to determine the exact ground of liability. In such circumstances, the defendant not being prejudiced for want of information regarding the injury to be redressed, there is no substantial reason why two apparent theories cannot, plaintiff acting in good faith, be joined up to such time as all reasonable uncertainty disappears as to which theory or cause of action is the correct one.  A complainant should not be precluded from presenting both of the somewhat inconsistent causes for adjudication, so long as he has reasonable ground for not waiving either."

The case of Southern Surety Co. v. Ft. Lupton Mercantile Co., 80 Colo. 80, 249 P. 263, 265, especially pertinent here, was one where there were two contracts for highway construction work let by the State of Colorado, one of them to a partnership and the other to a corporate successor to the firm.  The contracts called for construction of different portions of a concrete highway, a Federal Aid project, extending from the town of Brighton northward.  The defendant became surety on the two bonds given to secure performance of these contracts and also the due payment of all claims for labor and materials incurred thereunder.  Plaintiff's complaint set forth eleven causes of action, the first being for goods sold by plaintiff to the firm and to its corporate successor, and the other ten were for goods sold to and la-

bor performed for the corporation by various parties whose claims had been duly assigned to the plaintiff. The latter, in its pleading, alleged that it was impossible for it to state what portion of the merchandise was delivered to the firm or to the corporation, its successor, or to state how much of the merchandise thus sold "was used by said contractors in either one of said projects."

To the contention of the defendant that there could be no recovery, in consequence of plaintiff's inability to plead these facts, and in affirming the judgment against the surety company, it was said:

"The important and controlling question is: In the circumstances of this case can the plaintiff recover on the two bonds, notwithstanding that they were executed at different times, one with a copartnership and the other with a corporation, plaintiff being unable to specify what part or portion of the labor and material went into the construction of project A and what portion into the construction of project B? Defendant insists that this question should be answered in the negative.

"From the record it appears that the surety company must have had knowledge of how the work on the two projects was being carried on; * * * that the bills sued upon incurred after October 7, were contracted by the latter company, and of all other matters connected with or concerning the work on the two projects.

"As it would have been impossible for the claimants to have followed the items of material and labor into each project, we must say, if we adopt defendant's theory, that notwithstanding the material and labor for which this action was brought were furnished and supplied by the claimants to be used in the construction of these projects, and were actually used therein, yet they must lose all because they were unable to segregate the material and labor which entered into one of the projects from those which went into the other. In other words, we should hold that it was, in the circumstances

shown in this case, the duty of the materialman and laborer to protect and save harmless the surety company rather than that the surety company should, notwithstanding the broad terms of its bond, perform that service for them.

"* * * It doubtless has its remedy against the principals, but whether it has or not, we should not deny claimants the right to recover only because of their inability to segregate."

Section 95-204, Wyo. Rev. St. 1931, provides:

"No action shall be maintained on any such bond unless, within sixty days after the publication and posting of the notice provided for in article 3 hereof, the claimant shall serve upon the principal and his sureties a written notice specifying the nature and the amount of his claim and the date thereof, and no action shall be maintained on any such claim unless it is begun within one year after the service of such written notice on such principal and surety."

Complaint is made that appellant was not properly served with a written notice specifying the nature, amount, and date of the several claims in suit, as required by the statute above quoted. Our attention is directed to the case of Clinton v. Elder, 40 Wyo. 350, 277, P. 968, 971, 280 Pac. 889, where the court said. "And it seems to be well settled that where notice is required to be served, it means personal service, unless otherwise provided by statute." As the statute aforesaid does not otherwise provide relative to the service of notice, it must be taken, under the rule mentioned in the case last cited, to mean personal service. In the instant case, the proof is that the notices relied upon as furnishing compliance with the law were duly enclosed in envelopes and sent by United States registered mail, properly addressed, with the necessary fees and postage paid, to the surety at its Denver, Colorado office, and that official "Return Receipts" signed by said surety, showing receipt by it

of these several registered letters, were returned by the post office officials to the plaintiff and its assignors in due course of mail. These notices were mailed and delivered within the sixty days fixed by the statute aforesaid. Several months after this period had elapsed, the claimants received letters written on the letterhead of the appellant, of which the following received by the plaintiff is typical:

"Shoshoni Lumber Company
Shoshoni, Wyoming
Gentlemen:
James F. Turpen—Bonds 3551497, 3551498
State of Wyoming—Project 87-R
This is to advise you that this company, specifically reserving all of its rights under the above bonds and the laws of Wyoming, and particularly denying the service of any notice of your claim as required by law, denies any and all liability on your claim and refuses payment thereof.
Very truly yours,
(Signed) T. A. Mapes
Attorney & Adjuster"

Under these facts, the contention is specifically made for the surety that the record does not show personal service of the notice as the statute requires.

In Clinton v. Elder, supra, immediately preceding the excerpt quoted above, referring to the person who attempted to make the service in that case, the following language was used:

"The record does not even show whether White was an officer or not. Nor is it material whether he was or not. He made the service for and on behalf of Norah Elder, a private individual, and acted simply as her agent. She might have given the notice herself, but instead of doing so, employed White as her agent to do so in her behalf. He did not do so as an officer but as a private individual."

There appears to be a difference between official and statutory personal service, i. e., where service is required by the statute to be made by a certain person or official in a defined manner and within the jurisdiction where the statute controlling the matter is operative, and personal service where there is no statute in terms governing these details. In the latter case, personal service would seem to be the actual delivery of the notice, or other paper to be served, to the person who is to receive it. As intimated in the quotation last above made from Clinton v. Elder, this may be done by the party or his agent, and we see no reason why it may not be done by the officials of the United States post office, acting as agents for the party required to give the notice.

In Scanlon v. Scanlon, 154 Iowa 748, 135 N. W. 634, 636, the distinction we have mentioned is suggested and personal service, aside from official and statutory personal service, is defined. The case is relevant inasmuch as we, also, have no statute defining personal service, aside from service of process in a civil action. In the decision cited, in the course of its opinion, the court said:

"The statute (Code, § 3376) provides that the widow's share in her husband's estate cannot be affected by her husband's will, unless consent thereto is given within six months after a copy thereof has been served upon her by the other parties interested in the estate, and stating that she is required to make her election  Such election is to be made in open court or by writing filed therein which shall be entered on the proper records thereof; and, if at the expiration of six months no such election is made, it is to be conclusively presumed that the widow chooses to take under the will. As this statute provides that the notice must be 'served,' we think it should be held that a written notice is intended, but there is no direction that it shall be

served after the manner required by law for the service of original notice of the commencement of an action or proceeding in court, nor is there any general statute to that effect.

"It may also be admitted for the purposes of this case that, unless otherwise specified, a statute providing for the service of notice contemplates personal service, and not one which is merely constructive or substituted. But what is 'personal service'? As already suggested, we have no statutory definition of the phrase. The phrase has been defined by the courts as meaning 'actual service by delivering to the person, and not to a proxy.' See Hobby v. Bunch, 83 Ga. 1, 10 S. E. 113, 20 Am. St. Rep. 301; Bank v. Holmes, 12 N. D. 38, 94 N. W. 764. This court has defined it as 'the actual delivery in some way of the notice' to the person to whom it is directed (McKenna v. Ins. Co., 73 Iowa 455, 35 N. W. 520), and this we think is the substantial effect of all the authorities. It is not essential to such service that it be made by an officer."

McKenna v. Harrington Co., 96 N. J. Eq. 700, 126 A. 532, was a suit by Sadie McKenna against the company named, to redeem from a tax sale. The law required that, in order to cut off the equity of redemption vested in her, to premises sold for taxes to the defendant, that a notice to redeem from the sale should, to quote the statute (Comp. St. of N. J., p. 5137, para. 59), "be served personally on persons interested who reside in the taxing district." Holding that she had been personally served with the proper notice to redeem, with the consequent result of barring her equity of redemption in the premises in controversy, the Vice Chancellor used the following language:

"Because complainant resided in the taxing district, it was necessary for defendant to make service on complainant personally, either within or

without the taxing district, and the question for determination is: Was such personal service made?

"The Court of Errors and Appeals, in Wilson v. Trenton, 53 N. J. Law, 645, 23 A. 278, 16 L. R. A. 200, said concerning personal service as distinguished from official or judicial service, such as service of a summons in an action at law, and from substituted or constructive service, such as publication or posting, that personal service need not be made by an official, or in a particular mode. If the required notice be conveyed to the person to be affected thereby, it is sufficient, and that evidence of actual delivery to the party in person is conclusive proof of service.

"The complainant, in July, 1918, had a home in New York City, which she occupied during the greater part of the year. The uncontradicted proof on the part of the defendant is that on July 19, 1918, a notice to redeem in due form, inclosed in an envelope properly addressed to complainant at her New York City home, was registered by defendant's secretary at the Jersey City post office, for which registered letter such secretary received a receipt from the Jersey City postal authorities, bearing a registered letter number. Complainant, on her direct examination, made positive denial that she had received such notice to redeem, by registered letter or otherwise. She admitted often receiving registered letters, and could recall no such letter she had not opened. On cross-examination she was shown a registry receipt in the usual form, taken by the postal authorities upon delivery of a registered letter to the addressee, bearing a New York City postmark, dated July 20, 1918, which receipt bears the same registry number as the registry receipt delivered to defendant by the Jersey City post office, and shows the defendant to be the sender of the letter receipted for, and which receipt is signed 'S. McKenna,' and complainant identified such signature as her own handwriting. Upon being questioned by her counsel on redirect examination as to whether, having admitted her signature on the registry receipt, she had received a notice to redeem from defendant by

mail, she replied: 'Well, I do not remember having received any. I could not really tell you. I do not remember receiving anything.' Upon this evidence it seems clear that defendant's notice to redeem was delivered to complainant in person on or about July 20, 1918, and, upon the authority of Wilson v. Trenton, such service was personal service, within the meaning of the statute."

The Court of Errors and Appeals of New Jersey (96 N. J. Eq. 700, 126 A. 532) subsequently affirmed the decree below on the reasons thus stated of the Vice Chancellor.

A case decided under a statute almost identical in terms with section 95-204, supra, and involving the matter of recovery for unpaid labor on a state highway project, is Benson v. Barrett, 171 Minn. 305, 214 N. W. 47, 48. There, also, the question of whether the surety had been properly notified as required by law came up for decision. The following excerpt from the opinion filed, sufficiently discloses the facts and law of the case, as they bear upon the point in hand:

"The statute provides that no action shall be maintained on any such bond unless, within 90 days after the completion of the contract and acceptance by the proper authorities, the claimant shall serve upon the principal and his sureties a written notice specifying the nature and amount of his claim and the date of furnishing the last item thereof, nor unless the action is begun within one year after the service of such notice.

"On November 20, 1925, plaintiff mailed to the surety company, at its main office in the city of Milwaukee, a notice stating that the work of construction was completed in the month of September, 1925, that there was due him thereon a balance of $8,356.52, that the same had not been paid, and that he would look to the surety for payment under the bond. While the physical work may have been

completed prior to the time stated in the notice, the fact remains' that the commissioner of highways accepted the job on November 7, 1925. The statute is silent as to the manner of service of such notice. The surety company is a foreign corporation, and the notice might have been served upon its agent. However, the purpose of the service of such a notice was accomplished. It is not questioned but what the surety company received the notice mailed to it at Milwaukee. The record discloses that, following the mailing of the notice by plaintiff, the surety company corresponded with the bank with which plaintiff transacted his banking, with reference to the non-payment of the check which Barrett had given to the plaintiff. The notice was sufficient to inform appellant of the default on the part of the principal in the bond, which is the very purpose of the requirement of such notice. 23 C. J. 1101; Crystal Ice Co. v. United Surety Co., 159 Mich. 102, 123 N. W. 619.''

Recurring to the letters of the attorney and adjuster of the surety to the several claimants, previously mentioned, it will be observed that they merely deny "the service of any notice of your claim *as required by law.*" (italics ours). This did not deny the fact of service of notice. It merely questioned its legality. As heretofore pointed out, there was no evidence offered by the surety and there was no denial of the receipt of the notices aforesaid. In Soeding v. Bartlett, 35 Mo. 90, an answer denying that notice was served "as required by law" was under consideration and the court said:

"There was no issue in the case making any proof on the subject of the notice necessary; the allegation of the petition, that the respondents had given such notice, was not denied by the answer, and it therefore stood confessed. The answer denied 'any knowledge or information sufficient to form a belief whether or not a notice was served on them *as required by law.*' This averment proposed to make an issue as to the *lawfulness* merely of the notice,

and not as to the **fact** of notice   The fact being admitted, there was no issue for the jury; and, as a consequence, no testimony needed."

In the light of these authorities and the facts appearing here, we think that the district court was authorized to find as it did, that the surety was personally served with notice of the several claims, as the law required, with the one exception to be presently noted.

Our examination of the record has, however, necessarily impelled us to the conclusion that there was insufficient proof of personal service of the required notice relative to the claim of the Sunset Lumber and Hardware Company, as set forth in plaintiff's eighth cause of action. No witness conversant with the facts testified to the registry of a proper notice to the surety.   While it is stipulated that the account in question was received by the Insurance Commissioner of the State of Wyoming, we do not think that he was the proper party upon whom the service of such an account could be made.   His authority, both by the language of the statute and by the language of his appointment as its agent by the surety, was limited simply to the power to "acknowledge or receive service of process from any court of record, justice of the peace, or other inferior court."   The notice contemplated by the statute, section 95-204, supra, is not process.   See Atchison etc. R. Co. v. Sage, 49 Kan. 524, 31 P. 140.

No effort seems to have been made to require the surety to produce the registered letter and its contents, the return receipt for which it signed, and which appears in the record.   No effort was made to show that the Insurance Commissioner transmitted this account against the contractor, as received by

him, to the surety or that the latter received it from him.

It is urged that the notices sent to and served on the surety were defective in many ways. We have examined the record with this criticism in mind and we deem it sufficient to say that, in our judgment, they substantially complied with the statute and advised the recipient sufficiently of the nature, amount and date of the several claims. More than this, the statute did not require.

The contention is made that the right to perfect a claim for labor or material, made under a bond given pursuant to the provisions of section 95-201, Wyo. Rev. St. 1931, is personal to the one who furnished the material or performed the labor, and that an assignment of such a claim before the service of the notice provided for by section 95-204, supra, does not in any way assign the right to proceed against the bonding company. This is insisted upon, in view of service of notice of a number of the claims in suit only by the assignees thereof. Certain cases relating to assignment of unperfected mechanics' liens are cited and the argument is advanced that they are, by analogy, pertinent to the situation at bar.

We must say that we see some differences between the position of an owner of premises against which a mechanic or materialman asserts a lien and that of a paid surety who voluntarily goes upon the bond of its principal, contracting thereby to fulfill certain obligations, if the principal does not. There is no contractual relation existing between the owner and the materialman or laborer who deals with the contractor alone, and with whom alone the owner deals. On the other hand, there is a voluntary obligation assumed on the part of the surety to pay the laborer and materialman, if its principal does not do so. Again, by section 95-204, supra, the person to serve

the notice and perfect the right to maintain an action on the claim is merely designated generally as the "claimant," while, in the case of perfecting the mechanic's lien, the person to do so is particularly described as "every original contractor," "every subcontractor," and "every journeyman and day laborer, and every other person seeking to obtain the benefits" of the lien law (Rev. St. Wyo., 1931, §§ 66-501 et seq.). It would appear that the word "claimant," as used in section 95-204, is quite broad enough to include the assignee of a claim for labor and materials. When the assignment had been made, the assignee is certainly then the "claimant."

Assuming, however, that the analogy between the mechanics' lien law and the requirements of the several statutes here involved is perfect, it is evident from an examination of their decisions, that the courts are not in harmony as to whether, before it has reached the status of a perfected lien, the assignment of a claim for labor or materials will confer upon the assignee the right to take the necessary steps to complete it as such. Nevertheless, it is equally evident that the perfected lien is generally held to be assignable. Rockel on Mechanics' Liens, § 165; 18 R. C. L. 961, § 103; 40 C. J. 311, § 410. We have carefully examined the cases representing both views concerning the assignability of the right to perfect it and have little hesitancy in reaching the conclusion that the better reason and a result more in harmony, not only with the real purpose of the lien statutes, but also with modern business practice, is attained by those decisions which declare that the right vested in a contractor, laborer, or materialman under the mechanics' lien laws, even though not perfected as a lien, is assignable, and passes with the claim, and that the assignee thereof

may validly proceed to complete and enforce the lien.

Concerning this divergence of judicial opinion, Rockel on Mechanics' Liens, § 165, referring to the view permitting assignment of the right to perfect a lien, says, "The courts holding the latter view seem to be more in accord with the growing idea of the law, and in time this will no doubt become the prevailing doctrine."

The courts which do not allow the assignee of a claim for labor and materials 'to perfect the lien which secures it urge that:

"There is a double reason for the doctrine. The right of the sub-contractor against the owner is purely statutory, and such an assignee, not having performed the labor or furnished the material, is not within the terms of the act allowing a lien. Beyond that, the protection intended to be given is purely personal, and designed for the security of the mechanic and material man whose labor and materials have gone into the construction, and not for the safety of strangers, who merely purchase a debt"

Ogden v. Alexander, 140 N. Y. 356, 35 N. E. 638, 643.

The reasoning of those courts whose holding on the point meets with our approval is cogently stated by the following authorities:

In McDonald v. Kelly, 14 R. I. 335, the court said:

"The defendant contends that the lien is a purely personal privilege and cannot be assigned. There are cases which support this position, but we think with the master that, where the statute is silent on the point, as it is in this State, the weight of authority as well as the better reason is in favor of the assignability. The lien is a security, and, by analogy to other securities, it ought to follow the debt

or contract to which it appertains. It is not for the debtor to say that it shall not follow the debt; and evidently it is greatly to the advantage of the creditor to have it do so; for if it follows the debt, it enhances its value, because of the security which it affords. * * * The question must be decided here upon general principles. We can see no reason why the lien should not pass in equity with the debt or contract while it remains inchoate as readily as after it is consummate. It exists in right before the filing of the claim, adding to its value, and it is no more than equitable, for the sake of both assignor and assignee, that it should pass, to be perfected by the assignee in the name of the assignor."·

The Supreme Court of Appeals of Virginia, in Bristol Iron & Steel Co. v. Thomas, 93 Va. 396, 25 S. E. 110, 112, very well said that:

"It must frequently happen that the artisan, builder, mechanic, or lumber dealer, dies before the completion of the work upon which his labor has been performed, or to the construction of which he has furnished materials, or that from some other cause he is, without fault upon his part, unable to complete that which he has begun, and entitle himself to perfect the imperfect lien by doing what is prescribed in the succeeding section. To hold that he cannot impart to his assignee the faculty and power of perfecting the lien, would be, in all such cases, to rob him of the fruit of his toil by depriving him of the only mode by which it could be secured. If he is incapable of conferring upon another, by his voluntary act of assignment, the power of perfecting the inchoate lien, the executor and administrator, in the event of his death, would be equally impotent.

"In the case before us the assignment was for the benefit of creditors. The assignee is clothed with the duty of collecting the assets committed to his care, and applying them in accordance with the terms of his trust. The value of this claim is wholly dependent upon the lien by which it is secured, and

we are asked to declare that by the very act of assignment for the benefit of his creditors, by the very effort which the debtor makes to comply with his engagements, the value of the subject assigned is destroyed  He was placed in this position: He could not complete that which he had undertaken, and he himself could therefore not perfect the lien, and the construction asked for denies to him the right to clothe any one else with the power of doing it for him, which would result in the case of death or misfortune, or any unavoidable cause which prevented the completion of the contract in the loss to himself, his family, and his creditors of all that had been done under his contract.

"It is admitted in argument, and has been decided by this court, that the lien when perfected follows the assignment of the debt which it secures. See *Iaege v. Boissieux*, 15 Gratt. 83 (76 Am. Dec. 189).

"As a general rule, under our law any contractual right is assignable, and the assignment carries with it all liens given for its security.  As a rule a man may authorize another to do for him whatever he himself may lawfully do.  Section 2475 and 2476 are silent upon the right to make an assignment. The exact question is, for the first time, presented to this court for decision, and we feel free to adopt that construction which commends itself to us as reasonable and just"

In the comparatively recent case of West Jersey Homeopathic Hospital v. Gibbs, 103 N. J. Eq. 262, 143 A. 316, 317, the Vice Chancellor, after stating the result of an examination of the text writers who have undertaken to review the decisions of the several states of the Union, thus:

"Eliminating from that review the cases in which the assignments were made after the liens had been consummated by statutory demand and notice given by the laborer or materialman prior to the assignment, it will be found that the view which appears to have been more frequently entertained has been

to the effect that the right to perfect the lien by demand and notice is personal to the laborer or materialman and is not assignable, although many cases to the contrary are there collected."

nevertheless, concludes:

"It may be further suggested that an examination of the conflicting views entertained in the numerous cases to which reference is made by the text-writers already referred to strongly impels the acceptance of the more modern view that many distinctions have been made between personal and property rights, in determining their assignability, that appear more artificial than substantial, and that no satisfactory reason appears to exist why one who has the statutory right to consummate a lien may not assign that right to the purchaser of his claim."

Another quite late case, discussing the question, is Southern Surety Co. v. First State Bank, 54 S. W. (2d) (Tex. Civ. App.) 888. It was there held that a highway sub-contractor who procured advances from a bank for laborers and materialmen and assigned to it funds due him from the contractor, and subrogated the bank to his rights, the bank as assignee could perfect a lien on funds due the contractor from the state. Concerning this matter, the court said:

"Appellant's proposition is that the assignment of a laborer's or materialman's claim prior to the perfection of the lien, by compliance with the terms of the statute creating it, confers upon the assignee no right to have or perfect the lien to which the assignor was entitled. In other words, it contends that the assignment of a claim carries no lien unless the mechanic or materialman has previously proceeded to acquire or perfect a lien as provided by the statute. Vernon's Ann. Civ. St. art. 5472a, provides: 'That any person * * * furnishing any material * * * or labor to any contractor for any public

improvements in this State, shall have a lien on the moneys * * * due or to become due to such contractors for such improvements; provided, such person * * * shall, before any payment is made to such contractor, notify in writing the officials of the State * * * whose duty it is to pay such contractor of his claim.'

"Whether or not the bank, as the assignee of Lanier, had a right to perfect the lien created by the statute by filing the claim with the state highway department, is a question on which the courts are not agreed. Some courts hold that the right to perfect the lien is personal to the materialman or laborer mentioned in the statute and that his assignee who purchases the claim prior to the perfection of the lien cannot fix the lien; while others hold that the assignment of a lienable claim carries with it the right to the lien and clothes the assignee with the authority to take the necessary proceedings to perfect and enforce the lien. The authorities presenting the two views are correlated in 21 Ann. Cas. at p. 962. See, also, 40 C. J. 309, § 407.

"We are inclined to the view that the authorities supporting the theory that the assignee acquires the right to perfect and enforce the lien present the better reasoning. The general policy of the law in creating the lien is to protect the laborer or materialman to the end that he may receive full compensation for the labor or material so furnished and which has gone into the construction of the road. To allow the assignee to perfect the lien does the debtor no harm. He owes the debt and the funds are held by him subject to the right to fix the lien. It is of no concern to him who fixes it. On the other hand, it is of material advantage to the laborer or materialman that he be allowed to collect his claim as quickly as possible and that he receive full value therefor. If he be denied the privilege of assigning his equitable right to fix the lien along with his debt, it will often result that he must either suffer the delay and expenses incident to fixing the lien or else assign his claim at a discount and suffer the loss. He should be permitted to avail himself of

the security which the statute gives him in the way most beneficial to himself, and, if he can better himself, without injury to the debtor, by giving his assignee the right to perfect the lien, he should be permitted to do so. * * * (citing cases) Under our blended system a very liberal policy is recognized in the assignment of both legal and equitable rights. If a laborer can perfect his lien and assign it with his claim, we know of no reason why he should not be permitted to assign his right to perfect his lien along with his debt. This is particularly true where the statute, as in this case, does not require the one filing the claim to swear that the account is correct. * * * In the case at bar, the bank, by paying the laborer's and materialmen's claim with the understanding between it and Lanier that it should be subrogated to all his rights, acquired Lanier's right to perfect the lien. Fievel v. Zuber, 67 Tex. 275, 3 S. W. 273; 25 R. C. L. 1374. We are of the opinion that the bank as the assignee of Lanier had the right to perfect the lien by filing the claim with the state highway department."

We hold, therefore, in the case at bar, that the assignee of claims for labor or materials entering into the execution of the contracts here involved, could serve the notice required by section 95-204, supra, and acquire the right to maintain an action upon the assigned claim against the surety on the bond of the contractor, as provided by that section.

It appears that certain causes of action, which the judgment under review upheld, were grounded upon certain unpaid checks given by the contractor to persons performing labor in the execution of the contracts aforesaid. These checks were endorsed by the laborers to various parties who assigned their rights to the plaintiff. It is contended that there is no evidence that any of the claims for labor, for which the checks were given, were ever assigned to the check endorsees; that the endorsements, alone, of the several

checks failed to accomplish this and, hence, there can be no recovery on these causes of action.

The case of National Market Co. v. Maryland Casualty Co., 100 Wash. 370, 377, 170 P. 1009; 100 Wash. 377, 174 P. 479, 481, 1 A.L.R. 450, is chiefly relied on by appellant as upholding this contention. The final majority opinion perhaps does so, although there is some difference in the facts, the checks in the cited case being ordinary bank checks having nothing on their face to show what they were issued for, while in the case at bar, the checks carried on their face the notation "for Labor pro. 87-R," (pro. 87-R being explained in the record as the highway project number on which the work was done). It appears, however, from the report of the case, supra, that when it was first heard, an opinion was filed holding that the assignment of labor checks by mere delivery and endorsement constituted an assignment of the debts owed by the contractor to the laborers for work performed on a public improvement and of the laborers' claims against the contractor's bond conditioned to secure payment for labor and materials, and authorized the assignee to file a claim against the bond. This view was expressed although as we have remarked, the checks in that case did not show upon their face the nature of the indebtedness for which they were issued. On re-hearing, the membership of the court having been, in the meanwhile, somewhat changed, another opinion was filed concurred in by five judges, which reached a result directly to the contrary of the holding previously announced. The provisions of the negotiable instruments law of the state were relied upon, it would seem to enable the court to reach the final conclusion it did. Judge Parker, who wrote the original opinion, dissented and two of the judges, who had concurred in that opinion, concurred in the dissent. Judge Parker said, in part:

"I adhere to the views expressed in our former decision. I think the negotiable instruments law has no controlling force as between the contractor issuing these checks and the laborers, the payees thereof; nor as between the contractor and appellant, to whom the laborers transferred the checks. Nor do I think the answer to the question of the assignment of any funds supposed to be on deposit in the bank against which the checks were drawn is of any consequence here. To my mind the problem simply reduces itself to this: What are the rights of the laborers as against the casualty company, the surety upon the bond, and does appellant stand in the shoes of the laborers? That the laborers, even after receiving their checks, retained all their rights as against the surety, of course, is plain, because the checks, until they should be actually paid by the bank, would not pay the laborers' claims. I think it follows that, when the laborers transferred their checks to appellant, it then stood in the shoes of the laborers as to all their rights against the contractor and the surety."

As stated in the note to the last above cited case, in 1 A. L. R. 454, there is a dearth of authority on the precise question involved. The note cites the cases of Leach v. Hill, 106 Iowa 171, 76 N. W. 667, and the Chelmsford (D. C.) 34 Fed. 399, both of which decisions appear to reach a conclusion in harmony with the views of Judge Parker and those judges who agree with him in the National Market Company case, supra.

Substantially the same question subsequently arose for decision in Finch v. Enke, 54 S. D. 164, 222 N. W. 657, 658, as stated by the court:

"Second, do the provisions of the contract and bond and the indorsement and delivery by the payees of checks for labor and groceries used as aforesaid, and which checks have been dishonored, give to the indorsee and holder thereof a cause of action

against the surety for the debts incurred by the contractor for such labor and groceries?"

After quoting with approval from the opinion of the dissenting judges in the National Market Co. case referred to above, and reviewing the cases of Goldman v. Murray, 164 Cal. 419, 129 P. 462, and Leach v. Hill, supra, the doctrine whereof, it is pointed out, was approved in Midwest National Bank v. Niles, etc. Bank, 190 Iowa 752, 180 N. W. 880, 885, the court announced its conclusion in the following language:

"In the case at bar, the suit is not upon the checks alone, which were given for labor and groceries properly used in the furtherance of the work. Respondent agreed in the bond that the principal therein and his subcontractors would pay every laborer and all claims incurred for supplies in carrying out the provisions of said contract. Respondent is confronted by its contract as surety for the payment of such claims. When appellants became indorsees of such checks, they became assignees of a valid, equitable assignment from the payees of such checks; this equitable assignment transferred to appellants the rights of the payees to have their claims paid, if need be, by respondent, who had guaranteed their payment."

Our views coincide with those expressed by the Supreme Courts of South Dakota, Iowa, and Judge Parker in the National Market Company case aforesaid. We are unable to see that the negotiable instruments act aids in the solution of the problem. It may be noted, in this connection, that the prevailing opinion in the National Market Company case lays stress on the fact, in that case appearing, that "there was nothing on the face of the checks to show what they were issued for or differentiate them in any way from ordinary bank checks." In the case as bar the c h e c k s, as previously mentioned. show they

were for labor on the particular h i g h w a y project and r e s e m b l e, somewhat at least, the time checks held to be e q u i t a b l e assignments of labor claims in Northwestern Nat. Bank of Bellingham v. Guardian Casualty & Guaranty Co., 93 Wash. 635, 161 P. 473, Ann. Cas. 1918 D. 644, expressly approved by the majority opinion in the National Market Company case. We think, therefore, certainly under the circumstances presented here, that by endorsing these labor checks, the payees thereof intended to and did make an equitable assignment to their endorsees, of the right the payees had to have the claims the checks represented paid by the surety, as it had agreed to do when the contractor's funds failed to meet them.

Complaint is made that causes of action for the services of a cook at the construction camp near the bridge site and for groceries for use there were not items properly chargeable in the execution of the contracts and, hence, no recoveries thereon should have been permitted. We think the evidence was sufficient to enable the court to find that the camp was a necessary adjunct to the work, not run for profit, and hence, under the rule announced in Franzen v. Southern Surety Co., 35 Wyo. 15, 246 P. 30, 38, 46 A. L. R. 496, a recovery against the surety was properly allowed.

It is urged that the items for which a recovery was allowed, under the fifteenth cause of action relating to merchandise furnished the contractor by the Riverton Hardware Company and which the contractor, without objection, testified, "were used in the performance of these contracts," were improperly adjudged as chargeable against the surety. When the itemized account was offered in evidence, the only objection made to it, aside from its being "incompetent,

irrelevant, and immaterial," was that "practically all the items therein contained are not proper claims against the bonds rendered thereon. They are not lienable items." We think this objection too general and that no error was committed in admitting the evidence and, under the circumstances shown in the record, permitting a recovery thereon to the extent indicated in the judgment. See, also, Dennis v. Enke, 55 S. D. 15, 224 N. W. 925, infra; J. F. Tolton Inv. Co. v. Maryland Casualty Co., 77 Utah 226, 293 P. 611.

It is contended that recovery for the lumber for forms used in cement construction on the substructure contract, and contained in the plaintiff's account relied on in the first cause of action, was improperly allowed, and also items for coal used in blacksmithing on the work  Concerning the concrete forms items, it is evident from the contractor's testimony that most of the lumber employed for that purpose became thereby unfit for further use after the work was finished. The proof is that the lumber was sold to be used in the execution of these contracts and was so used. If this was not true, it was the duty of the surety to show it. As said in United States Fidelity & Guaranty Co. v. Yeilding Bros. Co. Department Stores, 225 Ala. 307, 143 So. 176, concerning materials sold to a contractor for use on the work:

"The seller could assume that they would be used for the purpose of performing the contract. The work was in progress. The contractor should probably have maintained a warehouse, instead of a commissary or store, open to the public, and have used the merchandise only to advance to the laborers and to feed them and the stock. But, when the prima facie case was made, the burden was upon defendant (the surety) to show that such supplies or some definite amount of them were not so used. Defendant stands for the contractor. This infor-

mation is or ought to be peculiarly possessed by the contractor. The seller is not so possessed. United States Fid. & Guar. Co. v. Benson Hdw. Co., supra; United States Fid. & Guar. Co. v. Simmons, 222 Ala. 669, 133 So. 731."

The status of material of this kind, as well as small tools and appliances necessarily and properly furnished in the execution of the contract, as affecting the liability of a surety on bonds such as are here involved, is very well stated by the court in Dennis v. Enke, 55 S. D. 15, 224 N. W. 925, 927, where the following language was used, referring to certain of its previous decisions:

"This court has indicated in those cases that absolute and entire consumption in the work is not essential to liability, and liability is not necessarily prevented by the fact that there may be some salvage value in the materials or other supplies. It is enough if they were purchased directly and particularly for the work, were proper for the work, and were used therein, and consumed therein to such an extent that their residual value is a salvage value only as distinguished from a new value, as illustrated by pipe cut and threaded in certain lengths, lumber cut up and nailed in place to make a tool shed or a form for cement, etc. That these items have some residual value is of course true, but it is a very different value both in kind and amount from that of new lumber or new pipe in standard lengths and dimensions, and this court has held, under the circumstances of the cases heretofore considered, that the existence of some such residual salvage value did not necessarily prevent liability on the part of the surety. * * * For example, general experience indicates that a crew of men engaged in the performance of a contract of this kind lose and break numerous small tools and items of equipment, such as shovels, spades, hammers, etc., by reason of which they are for all practical purposes really consumed in the performance of the contract, notwithstanding the fact that such tools,

if carefully handled and not lost, would be far from worn out by the actual amount of work for which they are used in the performance of a particular contract. If such small tools are purchased for the performance of the contract, are proper or reasonably necessary therefor, are used in such performance, and in such performance are lost or broken, and such loss or breakage is reasonably to be anticipated, it is entirely possible that the surety on the bond might be liable."

The views thus expressed have been approved and adopted by the Supreme Court of California in A. L. Young Machinery Co. v. Cupps, 213 Cal. 210, 2 P. (2d) 321. See, also, National Surety Co. v. Arizona Grocery Co., 32 Ariz. 399, 259 P. 404.

The contractor testified on cross-examination that he salvaged and sold $135 worth of lumber from these cement forms, after they had been used. That amount should, we think, properly be deducted from the amount of the recovery allowed on the first cause of action, as representing value of material not, in fact, consumed in the execution of the work. Some lumber of this character seems to have been stolen after it had been used. No effort was made to show how much was taken or its value. The duty to do so, we think, rested upon the surety through its principal, the contractor, who more than any other person, knew the facts.

So far as the items for coal referred to above are concerned, it is sufficient to recall the rule announced in Franzen v. Southern Surety Co., supra, that "Coal or gasoline that generates power is transformed into labor, and should be within the spirit of the statutes just as much so as labor performed by hand." It seems to us that coal which, when consumed, makes tools, rivets, and steel work useable on the work is quite as much within the terms of the statutes and bonds given under it as coal

used for generating power which puts material in its proper place in the work. Both seem to us "material furnished in the execution of the contract" and fairly within the contemplation of the parties when executing the contract and bond therefor. See McCormick Seeltzer Co. v. Haidlen, 119 Cal. App. 96 6 P. (2d) 255.

All of the contentions which appear to have been seriously urged in the briefs by the parties have been given careful consideration. They have not been free from difficulty, as usually is so when able judicial opinion is sharply divided on questions submitted. It remains, therefore, for us simply to state our disposition of the case. The judgment of the District Court from Natrona County will be modified by returning the amount allowed on the first cause of action as against the surety in the sum of $135; the judgment, as it relates to the eighth cause of action against the surety will be reversed and a new trial ordered. In all other respects, the judgment appealed from is affirmed.

KIMBALL, C. J., and BLUME, J., concur.