

DA 06-0282

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 74

STOCKMAN BANK OF MONTANA, a Montana
banking corporation,

        Plaintiff and Appellant,

    v.

MON-KOTA, INC., a Montana corporation; BETASEED, INC.,
a Minnesota corporation; AGSCO, INC., a North Dakota
corporation; CAPITAL HARVEST, INC., d/b/a CAPITAL
HARVEST FINANCE CO., a North Dakota corporation,
individually, and as agent for AGSCO, INC.; FARMERS UNION OIL
COMPANY OF WILLISTON, a North Dakota cooperative association;
OELKERS, INC., a Montana corporation; ELLEN RASMUSSEN,
individually and as partner in Flying O Ranch Partnership;
FLYING O RANCH PARTNERSHIP, a partnership consisting of,
among others, Ellen Rasmussen; WILSON SCOTT BERRY, a/k/a
SCOT BERG; SUSAN ZIMMERMAN; CHARLES LOWMAN,
a/k/a CHUCK LOWMAN; PT FARMS, INC.; and PAUL TJELDE,

        Defendants and Appellees.

AGSCO, INC., and CAPITAL HARVEST, INC.,

        Third-Party Plaintiffs, Counter-claimants and Cross-claimants,

    v.

HARDY FARM, INC., STOCKMAN BANK OF MONTANA,
MON-KOTA, INC., BETASEED, INC., FARMERS UNION
OIL COMPANY OF WILLISTON, OELKERS, INC., ELLEN
RASMUSSEN, FLYING O RANCH PARTNERSHIP, WILSON
SCOTT BERRY, SUSAN ZIMMERMAN, CHARLES LOWMAN,
JIM HARDY, J.W. HARDY, JR., and JOHN DOES A-Z,

        Third-Party Defendants, Counter-Defendant and Cross-Defendants.

APPEAL FROM:    District Court of the Seventh Judicial District,
                In and For the County of Richland, Cause No. DV-03-11,
                Honorable Katherine M. Irigoin, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Kevin Paul Heaney, Crowley, Haughey, Hanson, Toole & Dietrich, P.L.L.P., Billings, Montana

Garth Hans Sjue, Crowley, Haughey, Hanson, Toole & Dietrich, P.L.L.P., Williston, North Dakota

For Appellees:

Charles W. Hingle and Shane P. Coleman, Holland & Hart, LLP, Billings, Montana (AGSCO and Capital Harvest)

Lyle R. Panasuk, Attorney at Law, Sidney, Montana (PT Farms and Tjelde)

Harry Malcolm Pippin, Attorney at Law, Williston, North Dakota (Betaseed)

Charles Lohman, pro se, Sidney, Montana

Submitted on Briefs:  April 18, 2007

Decided:  March 4, 2008

Filed:

_____
Clerk

2

Justice Jim Rice delivered the Opinion of the Court.

¶1 Appellant Stockman Bank of Montana (Stockman Bank) appeals from the Seventh Judicial District Court's orders granting the motion of Appellees, AGSCO, Inc. (AGSCO), and Capital Harvest, Inc. (Capital Harvest), for summary judgment and denying Stockman Bank's motion to alter or amend judgment. Appellant Stockman Bank contends that Appellees have improperly used Montana's agricultural lien statute to obtain a lien with "superpriority" over the prior perfected security interest held by Stockman Bank in the same crop collateral. We affirm.

¶2 We restate the issues on appeal as follows:

¶3 1. Did the District Court err in granting summary judgment to Appellees because they did not satisfy the procedural requirements for filing and perfecting an agricultural lien?

      a. Failure to provide advance notice of its intent to file a lien under § 71-3-902(2), MCA;

      b. Failure to file a Uniform Commercial Code financing statement.

¶4 2. Did the District Court err in granting summary judgment to Appellees because an inchoate lien cannot be assigned and filed by the assignee?

## BACKGROUND

¶5 This case involves claims by a number of competing creditors asserting priority in certain sugar beet revenues. Stockman Bank is a Montana banking corporation with an office in Sidney, Montana. The Sidney office lends to, among others, agricultural producers in eastern Montana and western North Dakota. Stockman Bank served as the

primary lender for Hardy Farm, Inc. (Hardy Farm), a North Dakota farming corporation, for the 2002 growing season, lending Hardy Farm money to pay operating expenses in connection with its farming operation, which included lands in Montana. On or about January 7, 2002, Hardy Farm delivered a promissory note in the amount of $4,991,039 to Stockman Bank, which included indebtedness on a 2001 operating loan that remained unpaid and a new loan for 2002 farming expenses. On or about August 15, 2002, Hardy Farm delivered a second promissory note in the amount of $356,979 to Stockman Bank for a second loan for additional 2002 farming expenses. Pursuant to the relevant security agreements between Stockman Bank and Hardy Farm, Stockman Bank took a security interest in certain of Hardy Farm's personal property, including its crops and crop revenues (the subject of this action) to secure repayment of said loans. Stockman Bank perfected a security interest in the personal property by filing the appropriate financing statements in North Dakota and Montana.

¶6      AGSCO is a North Dakota corporation that sells agricultural chemicals to growers in North Dakota and Montana. Capital Harvest is a corporate affiliate of AGSCO. AGSCO sells agricultural chemicals through its own retail stores, and Capital Harvest finances the purchase of those chemicals. Both AGSCO and Capital Harvest are owned by Randy Brown, the principal stockholder. During the 2002 growing season, AGSCO sold Hardy Farm roughly $500,000 in agricultural chemicals and services using a line of credit approved by Capital Harvest. On October 29, 2002, Capital Harvest filed an agricultural lien with the office of the Montana Secretary of State for the agricultural

4

chemicals furnished, pursuant to § 71-3-901 et seq., MCA.[1,2]  On the same day it filed the agricultural lien, Capital Harvest also mailed notice to Hardy Farm that it was filing the lien.  Three days after mailing the notice, Capital Harvest filed a second lien to cure its first lien's failure to properly describe the land upon which AGSCO's chemicals were applied.

¶7     The sugar beet crop was sold by Hardy Farm to Holly Sugar and Sidney Sugars, Inc.  These buyers issued payment instruments which were jointly payable to Stockman Bank and one or more other parties, including Appellees.  Stockman Bank consequently filed an action to determine the respective rights among the numerous parties as to the various checks, which represented both 2001 and 2002 sugar beet revenues, and as to future checks that would be issued for those growing years.[3]  In conjunction with bringing the action, Stockman Bank deposited checks totaling $1,846,392.96 into two courts: approximately 40 percent ($725,750.31) was deposited with the Montana Seventh Judicial District Court, Richland County, and 60 percent ($1,120,642.65) was deposited with a state district court in North Dakota, where litigation also ensued.[4] The only

---

[1]References to the MCA herein are to the 2001 version unless expressly stated otherwise.

[2]AGSCO also filed a lien for $35,142.61, but the only agricultural lien at issue is the $500,000 lien claimed by Capital Harvest.

[3]Appellees' claims did not include revenues from the crops grown in Montana by Hardy Farm in 2001.

[4]The Supreme Court of North Dakota affirmed the district court ruling there that AGSCO/Capital Harvest had a valid lien and was entitled to the revenue from the crop sales deposited with the court.  The North Dakota Court did, however, remand for a determination of the appropriate allocation of supplies applied to crops in North Dakota. *Stockman Bank of Montana v. AGSCO, Inc.*, 728 N.W.2d 142 (N.D. 2007).

5

unresolved claims that remain in this action are between Stockman Bank and Appellees, with Stockman Bank claiming a priority to all of the funds deposited with the Montana District Court due to its perfected security interests.

¶8 Stockman Bank and Appellees each filed cross-motions for summary judgment asking that the District Court determine as a matter of law that their respective claims to the funds deposited with the District Court were superior. The motions were heard on December 4, 2003, and thereafter the District Court denied Stockman Bank's motion for summary judgment and granted partial summary judgment in favor of Appellees— effectively declaring the agricultural lien to be both valid and of "superpriority."

¶9 After the District Court granted partial summary judgment to Appellees, issues remained as to the proper amount of the lien. Consequently, the parties stipulated between themselves in regard to the amount of chemical sold by AGSCO to Hardy Farm that were applied to crops in Montana in 2002, and to the interest on the funds deposited with the District Court to be credited on such sum. On October 25, 2005, pursuant to the parties' stipulation, the District Court ordered that the amount of the agricultural lien filed in Montana by Capital Harvest was $196,000 plus interest and ordered that sum be paid from the funds deposited with the court. The court further ordered that the remaining funds, including interest earned, be paid to Stockman Bank, and entered judgment.

¶10 Stockman Bank subsequently filed a motion to alter or amend judgment, or for relief from judgment or order. The District Court denied the motion on May 16, 2005. Stockman Bank appeals.

6

## STANDARD OF REVIEW

¶11 "We review a district court's grant of summary judgment de novo, using the same Rule 56, M. R. Civ. P., criteria as applied by that court." *Hi-Tech Motors, Inc. v. Bombardier Motor Corp. of America*, 2005 MT 187, ¶ 32, 328 Mont. 66, ¶ 32, 117 P.3d 159, ¶ 32 (citing *Arthur v. Pierre Ltd.*, 2004 MT 303, ¶ 14, 323 Mont. 453, ¶ 14, 100 P.3d 987, ¶ 14). In that regard, M. R. Civ. P. 56(c), provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The party moving for summary judgment must establish the absence of genuine issues of material fact and entitlement to judgment as a matter of law. "If this burden is met, then the burden shifts to the nonmoving party to establish that a genuine issue of material fact exists." *Hi-Tech Motors, Inc.*, ¶ 32 (citing *Arthur,* ¶ 14). If the district court determines no genuine issue of material fact exists, it then determines whether the moving party is entitled to summary judgment as a matter of law. This determination is a conclusion of law which this Court reviews for error. *Hi-Tech Motors, Inc.*, ¶ 32 (citing *Arthur,* ¶ 14).

¶12 This Court reviews a district court's denial of a M. R. Civ. P. 59(g) motion to amend for abuse of discretion. *Lee v. USAA Cas. Ins. Co.*, 2001 MT 59, ¶ 27, 304 Mont. 356, ¶ 27, 22 P.3d 631, ¶ 27 (citation omitted). "The test for abuse of discretion is whether the trial court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice." *Jarvenpaa v. Glacier Elec. Coop., Inc.,* 1998 MT 306, ¶ 13, 292 Mont. 118, ¶ 13, 970 P.2d 84, ¶ 13 (citation omitted). "Our standard in reviewing a ruling on a Rule 60(b)(6), M. R. Civ. P., motion

7

for relief from judgment depends on whether or not the judgment is set aside."
*Calcaterra v. Montana Resources*, 2001 MT 193, ¶ 7, 306 Mont. 249, ¶ 7, 32 P.3d 764, ¶ 7, *overruled on other grounds, Essex Ins. Co. v. Moose's Saloon, Inc.*, 2007 MT 202, ¶ 17, 338 Mont. 423, ¶ 17, 166 P.3d 451, ¶ 17 (citing *Karlen v. Evans*, 276 Mont. 181, 185, 915 P.2d 232, 235 (1996)). "Where, as here, the judgment is not set aside, only a slight abuse of discretion need be shown to warrant reversal." *Calcaterra*, ¶ 7 (citation omitted).

## DISCUSSION

¶13 **Did the District Court err in granting summary judgment to Appellees because they did not satisfy the procedural requirements for filing and perfecting an agricultural lien?**

> *a. Failure to provide advance notice of its intent to file a lien under § 71-3-902(2), MCA.*

¶14 The District Court, in granting partial summary judgment in favor of Appellees, determined that the Montana Legislature had eliminated the requirement of advance notice of intent to file a lien, formerly contained within § 71-3-902(2), MCA, in the 1999 Legislative session. The court therefore concluded that the "failure of Capital Harvest to give advance notice of intent to file a lien in 2002 did not prevent it from perfecting [an agricultural] lien against Hardy Farms."

¶15 Section 71-3-902, MCA, provides:

> (1) A person, firm, corporation, or partnership that is entitled to a lien under this part shall, within 90 days after the last labor or service was performed or material furnished in crop dusting or spraying grains or crops, file in the office of the secretary of state a statement of agricultural lien as provided in 71-3-125.

> (2) A person, firm, corporation, or partnership that is entitled to a lien and that intends to file a lien under this part shall give notice, by certified

8

> mail, of intent to file to the person, firm, corporation, or partnership for which labor or service was performed or materials furnished.

Stockman Bank contends that the District Court's entry of summary judgment was in error because Capital Harvest failed to comply with an express procedural condition of this statute. Stockman Bank argues that the plain language of § 71-3-902(2), MCA, requires that a person or entity desiring to file a lien give notice before actually doing so. It notes that the statute references notice "of intent to file" and concludes that such notice can be only provided in advance of filing. Stockman Bank maintains that because the legislative intent can be determined from the plain language of the statute, the legislative history is irrelevant and that Capital Harvest's failure to provide advance notice to Hardy Farm renders the lien invalid.

¶16 Appellees counter that Stockman Bank's advance notice argument relies upon a statutory requirement that was expressly repealed and conflicts with the legislative history of the statute, which clearly indicates an intention to repeal the advance notice requirement. As such, Appellees explain that Capital Harvest filed an agricultural input lien with the Montana Secretary of State on October 29, 2002, and properly gave notice to Hardy Farm by mail on the same day. Moreover, Appellees contend that, even under Stockman Bank's statutory interpretation, the notice was properly given because the notice served on October 29, 2002, predates the second lien statement filed on November 1, 2002, which was filed to cure a defect in the first lien statement.[5]

---

[5]Appellees acknowledge the first lien statement filed on October 29, 2002, was invalid because it did not "describe[ ] the land upon which the service was performed." Section 71-3-125(2)(l), MCA.

9

¶17     When the legislative intent cannot be readily derived from the plain language, or when it is helpful to determine the correct interpretation of the statute, we review look to legislative history.  *Montanans for Justice v. State*, 2006 MT 277, ¶ 60, 334 Mont. 237, ¶ 60, 146 P.3d 759, ¶ 60; *see also Associated Students of U. of Montana v. City of Missoula*, 261 Mont. 231, 237, 862 P.2d 380, 383 (1993).  First, in 1995, § 71-3-902, MCA, was amended to *add* a thirty-day advance notice requirement. The statute thereafter provided:

> A person, firm, corporation, or partnership that is entitled to a lien and that intends to file a lien under this part *shall give 30 days' notice*, by certified mail, of intent to file to the person, firm, corporation, or partnership for which labor or service was performed or materials furnished.

Section 71-3-902(2), MCA (1995) (emphasis added).  Committee minutes from a legislative hearing in the 1995 Session reflect that Senator Loren Jenkins, the sponsor, stated the bill was intended to give notice that a lien would be filed and that a farmer had thirty days to pay, thus giving the farmer adequate notice prior to filing of the lien.  Mont. Comm. on Agric., Livestock & Irrigation, *Hearing on SB 106*, 54th Reg. Sess. 6 (Jan. 16, 1995).  However, four years later, the Legislature removed the advance notice requirement.  Senator Jon Tester, sponsor of SB 187, explained that the bill had a simple purpose: to remove the requirement of thirty-days advance notice before filing an agricultural lien.  Mont. Comm. on Bus. & Indus., *Hearing on SB 187*, 56th Reg. Sess. 2 (Jan. 20, 1999).  During committee consideration of the bill, Senator Bea McCarthy recounted testimony from the Montana Aviation Trades Association to the effect that because some products could be applied up to fifteen days before harvest, the current law was untenable:  if providers had to wait thirty days before they could file a lien, a crop could be harvested and the lienor would not have access to it.  Mont. Comm. on Bus. & Indus., *Hearing on SB 187*, 56th Reg. Sess. 3 (Jan. 20, 1999).

10

¶18    The removal of the advance notice requirement left the statute providing that "[a] person, firm, corporation, or partnership that is entitled to a lien and that intends to file a lien under this part shall give notice, by certified mail, of intent to file to the person, firm, corporation, or partnership for which labor or service was performed or materials furnished." Section 71-3-902(2), MCA. This represents a distinct change from the 1995 version of the statute. Clearly, a public policy determination was made that the thirty-day advance notice requirement was inappropriate in light of the potential timeline involved with harvesting farm products.

¶19    Stockman Bank argues that § 71-3-902, MCA, still includes the language "shall give notice . . . of intent to file," infers therefrom that advance notice must nonetheless be provided within some reasonable amount of time before the lien claimant actually files the lien, and requests that this Court designate the time requirement. However, in light of the clear legislative history, we cannot conclude that Capital Harvest's action of filing the lien and mailing notice on the same day constituted a violation of the statute. The Legislature deleted the advance notice requirement in favor of a notice without a specific time requirement, and we are loath to legislate one ourselves. It cannot be disputed that notice of Capital Harvest's "intent" was indeed given. Neither does Stockman Bank allege any harm from the notice given by Capital Harvest on the same day the lien was filed.

¶20    We conclude that the District Court did not err in holding that § 71-3-902(2), MCA, did not require Capital Harvest to give advance notice of its lien to Hardy Farm.

**b.  *Failure to file a Uniform Commercial Code financing statement.***

11

¶21 Stockman Bank argues that, in addition to filing an agricultural lien statement, Capital Harvest was also required to file a Uniform Commercial Code (UCC) financing statement. Stockman Bank contends that § 71-3-901, MCA, the agricultural lien statute, merely grants a lien upon "grains or crops dusted or sprayed" which does not attach to proceeds from the sale of those crops. Thus, according to Stockman Bank, the only way Capital Harvest could have obtained a lien against the proceeds of the sugar beets at issue was to also file a UCC financing statement in North Dakota, the location of debtor Hardy Farm. Stockman Bank maintains that Capital Harvest's failure to file the UCC financing statement left it unperfected as to the cash proceeds of the sugar beets, and, by virtue of Stockman Bank's properly perfected security interest, it is entitled to all of the proceeds in dispute. Stockman Bank's argument is essentially three-fold: (1) Capital Harvest failed to file a mandatory UCC financing statement; (2) Capital Harvest failed to file in North Dakota; and (3) Capital Harvest's agricultural lien statement was inapplicable to proceeds of the sale of the sugar beets.

¶22 Appellees respond that the UCC, even if applicable, does not require lien claimants to file a separate UCC financing statement in addition to the agricultural lien statement they filed. They further argue that if the UCC applies to Title 71 liens, then Montana's statutorily-mandated agricultural lien statement meets all the requirements of a UCC financing statement. Thus, citing § 1-3-223, MCA, Appellees argue that Montana law does not require the "idle act" of filing two forms containing the same information with the Secretary of State for recording within the same centralized database. To

12

resolve these issues, we are faced with the weighty task of determining the working relationship between Title 71 agricultural liens and Revised Article 9 of the UCC.

¶23    Generally defined, an agricultural lien is a non-consensual charge or encumbrance upon property created by operation of law when a person supplies goods or services to another engaged in the business of producing farm products. *See Black's Law Dictionary* 941 (Bryan A. Garner ed., 8th ed., West 2004).[6]  These liens commonly cover suppliers of seed, fertilizer, and pesticides, as do Montana's statutory liens, and allow them to be filed without the farmer's consent.  At issue here is one of several agricultural lien statutes, § 71-3-901 et seq., MCA, which addresses fertilizer and pesticide liens.  Section 71-3-901, MCA, describes who is eligible to have a fertilizer and pesticide lien:

> A person, firm, corporation, or partnership that under contract, express or implied, performs labor or services or furnishes material in crop dusting or spraying grains or crops, whether by aerial or ground application, for the purpose of fertilization or weed, disease, or insect control for promoting the growth of the grains or crops has a lien upon all grains or crops dusted or sprayed for and on account of the labor or service performed and material furnished, upon complying with the provisions of this part. A lien may not exceed the prevailing price charged in the particular locality in which the grain or crops are sprayed or dusted.

The time and manner of filing on the lien is also set forth in statute:

[6] Black's Law Dictionary fully defines "agricultural lien" as follows:
> 1. A statutory lien that protects a seller of farming equipment by giving the seller a lien on crops grown with the equipment. [Cases: Agriculture 10. C.J.S. *Agriculture* §§ 105, 113-114, 119-120.] 2. *Secured transactions*. An interest (other than a security interest) in farm products having three characteristics: (1) it must secure payment or performance of an obligation for goods or services furnished in connection with a debtor's farming operation, or of an obligation for rent on real property leased by a debtor in connection with farming; (2) it must be created by statute in favor of a person either who in the ordinary course of business furnished goods or services to a debtor in connection with the debtor's farming, or who leased real property to a debtor in connection with the debtor's farming; and (3) the effectiveness of the interest must not depend on the person's possession of the personal property.

> A person, firm, corporation, or partnership that is entitled to a lien under this part shall, within 90 days after the last labor or service was performed or material furnished in crop dusting or spraying grains or crops, file in the office of the secretary of state a statement of agricultural lien as provided in 71-3-125.

Section 71-3-902(1), MCA.

¶24 In contrast, the UCC is a comprehensive code addressing most areas of commercial law, including equipment leasing, sale of goods, negotiable instruments, bank deposits and collections. Article 9 of the UCC deals with secured transactions. Section 30-9A-101, MCA. In 1999, Montana enacted *Revised* Article 9, with the delayed effective date of July 1, 2001. Revised Article 9 was drafted by the National Conference of Commissioners on Uniform State Laws and the American Law Institute, and came to the Montana Legislature "ready-made"—the drafting was essentially complete and the draft vetted to the public in an effort to create "enactable" and uniform legislation for the States.

¶25 However, conveniently pre-packaged uniform legislation can also cause unforeseen side effects, because the enactment of uniform laws "often sets off a chain reaction among [a jurisdiction's] existing statutes." Scott J. Burnham, *Agricultural Liens under Revised Article 9*, 63 Mont. L. Rev. 91, 93 (2002). We are confronted with such consequences here. Revised Article 9, like its predecessor, provides a comprehensive scheme for the regulation of security interests in personal property and fixtures, but unlike the original Article 9, also brings within its scope non-possessory agricultural liens—an area of law in which Montana already had a significant body of statutes. Thus, this Court must determine how the two bodies of law interact.

14

¶26    Critical to an accurate reading of the agricultural lien provisions within Revised Article 9 is an understanding that *agricultural liens are not security interests*.  A security interest is defined as "an interest in personal property or fixtures that secures payment or performance of an obligation," § 30-1-201(37)(a), MCA, while an agricultural lien is "an interest, *other than a security interest*, in farm products . . . ." Section 30-9A-102(1)(e), MCA (emphasis added).  Thus, the UCC defines these interests in mutually exclusive terms.  Consequently, when the UCC drafters desired to apply a particular provision to both agricultural liens and to security interests, the drafters expressly referred to both. *See* Burnham, 63 Mont. L. Rev. at 95 ("[O]nly those parts of Revised Article 9 that expressly refer to agricultural liens, rather than those that refer only to security interests, are applicable to agricultural liens.").  Thus, merely because collateral consists of farm products does not automatically turn an agricultural lien into a security interest.  This conceptual separation between "security interest" and "agricultural lien" means that agricultural liens are only partially incorporated into Revised Article 9.  *See* Eric J. Pullen, *Revised Article 9 of the Uniform Commercial Code and Agricultural Liens in Texas*, 40 Tex. J. Bus. L. 1, 10 (2004) ("Because of the unique treatment afforded to agricultural liens under Revised Article 9, these liens have been described as having 'one foot in Article 9 and one foot out of it' . . . .").  We must determine today which parts are "in" and which are "out."  In so doing, we turn to the fundamental concepts of attachment and perfection.

***Attachment***

15

¶27 Attachment is the process by which a secured interest is created between the creditor and the debtor with respect to a particular piece of property. *See* 68 Am. Jur. 2d *Secured Transactions* § 240. The attachment rules in Revised Article 9, set forth in § 30-9A-203 et seq., MCA, are made applicable to interests arising from a "security agreement," defined as "an agreement that creates or provides for a security interest." Section 30-9A-102(1)(uuu), MCA. Thus, the mutually exclusive definitions immediately come into play. Because, as discussed above, agricultural liens are not "security interests," the Revised Article 9 attachment rules are not applicable to agricultural liens. "[I]nstead, agricultural liens attach according to the particular rules in the statute that creates them." *See* Pullen, 40 Tex. J. Bus. L. at 14 (citing Julian B. McDonnell, *Farm Financing Under Revised Article 9*, in *1D Secured Transactions Under the Uniform Commercial Code* 26-1, 26-14 (2003)). Stockman Bank does not contend that Capital Harvest's agricultural lien did not attach under Montana law.

### *Perfection*

¶28 While attachment makes an agricultural lien effective as between the supplier and the debtor, perfection is the mechanism by which a supplier establishes his or her priority in relation to other creditors of the debtor in the same collateral. *See Black's Law Dictionary* at 1173 (defining "perfection" as "[v]alidation of a security interest as against other creditors, usu. by filing a statement with some public office or by taking possession of the collateral."); *see also* 68 Am. Jur. 2d *Secured Transactions* § 240. Section 71-3-902(1), MCA, set forth above, clearly delineates the procedure to be followed to perfect an agricultural lien: filing a statement of agricultural lien in the office of the Secretary of

16

State within ninety days after furnishing the last labor or service. Stockman Bank does not contend that Capital Harvest's lien statement was insufficient to perfect its lien for purposes of Title 71.

¶29 The question raised because of Revised Article 9's inclusion of agricultural liens within its scope is "what priority the agricultural lienor will enjoy or suffer in a conflict with an Article 9 secured party." Donald W. Baker, *Some Thoughts on Agricultural Liens Under the New U.C.C. Article 9*, 51 Ala. L. Rev. 1417, 1450 (2000). Agricultural liens are granted a "superpriority status" by the Montana agricultural lien statutes, which provide: "The lien for labor or services performed or material furnished as specified in this part *shall be prior to and have precedence over any mortgage, encumbrance, or other lien* upon said grain or crops . . . ." Section 71-3-904, MCA (emphasis added). Under the statute, this superpriority status is not dependent upon being the first to file. However, Stockman Bank's argument is that Capital Harvest's lien, though perfected for purposes of the agricultural lien statute, was not perfected for purposes of the UCC, and thus did not obtain priority over the Bank's earlier perfected secured interest.

¶30 Consistent with the priority given to liens under our agricultural lien statutes, Revised Article 9 recognizes that an agricultural lien may be granted priority by local law over a competing Article 9 security interest. "A perfected agricultural lien on collateral has priority over a conflicting security interest in or agricultural lien on the same collateral if the statute creating the agricultural lien so provides." Section 30-9A-322(7), MCA. However, the critical point here, which gives rise to Stockman Bank's argument, is that this UCC provision recognizes the priority only of a "*perfected* agricultural lien."

17

Further, the UCC defines what it means by the term "perfected agricultural lien": "An agricultural lien is perfected if it has become effective *and all of the applicable requirements for perfection in 30-9A-310 have been satisfied.*" Section 30-9A-308(2), MCA (emphasis added). Thus, even though Montana's fertilizer and pesticide lien statute purports to grant an agricultural lien absolute priority over "any" other security interest if perfected under Title 71, Revised Article 9 requires that an agricultural lien must also satisfy the requirements of § 30-9A-310, MCA, in order to be perfected and obtain priority over security interests established under the UCC.

¶31　Faced with these dual provisions, we must determine how they are to be applied. We are mindful of the canons of statutory construction which aid our resolution of this issue. First, "this Court must harmonize statutes relating to the same subject, as much as possible, giving effect to each." *Oster v. Valley County*, 2006 MT 180, ¶ 17, 333 Mont. 76, ¶ 17, 140 P.3d 1079, ¶ 17 (citation omitted). We further note that "[s]tatutory construction is a 'holistic endeavor' and must account for the statute's text, language, structure, and object." *State v. Heath*, 2004 MT 126, ¶ 24, 321 Mont. 280, ¶ 24, 90 P.3d 426, ¶ 24 (citations omitted). "Our purpose in construing a statute is to ascertain the legislative intent and give effect to the legislative will. Section 1-2-102, MCA." *Heath*, ¶ 24.[7]

[7]We are also aware that "this Court follows the rule that where a specific statute conflicts with a general statute, the specific controls over the general to the extent of any inconsistency." *Gallatin Saddle & Harness Club v. White*, 246 Mont. 273, 276, 805 P.2d 1299, 1301 (1990). However, with regard to the respective provisions governing the process of perfecting agricultural liens, we view the two statutes to be of equivalent specificity.

¶32 We do not believe these provisions are irreconcilable. It is clear from the above discussion that Revised Article 9 acknowledges existing agricultural lien statutes and expressly incorporates them into its priority scheme. We thus believe the Legislature did not intend for the agricultural lien statutes to be superseded by the later passage of Revised Article 9, but, rather, for these two statutes to work in coordination. Revised Article 9 likewise recognizes and respects the "superpriority" granted to agricultural liens by local law, but simply requires that those liens also be perfected in satisfaction of § 30-9A-310, MCA.

¶33 In summary, although agricultural lienors must satisfy the perfection requirements of § 30-9A-310, MCA, in addition to the perfection requirements of the lien statutes, by doing so they will be insulated from Revised Article 9's "first in time" rule and retain the "superpriority" status of their liens. Here, Capital Harvest's perfection efforts were required to have complied with the prerequisites of § 30-9A-310, MCA, in addition to satisfying Title 71's requirements, in order to obtain priority over Stockman Bank's previously perfected secured interest.

***Perfection under the UCC: Designation of "local law" and place of filing***

¶34     Having concluded that a Montana agricultural lien is subject to UCC perfection requirements, we then turn to the application of "local law." The UCC, in turn, incorporates local or state law with regard to certain mechanical requirements of perfection and where, as here, more than one state is potentially involved, we must determine which jurisdiction's "local law" is designated by the UCC as governing the mechanics of perfection for this transaction.

¶35     Stockman Bank argues that Capital Harvest's filing could not have satisfied UCC perfection requirements because it was not filed within the state designated by the UCC as the governing local law. Stockman Bank urges that, because Hardy Farm was a North Dakota corporation and therefore located in North Dakota, the UCC required Capital Harvest to follow the law of North Dakota as the "local law," which required perfection of its agricultural lien in that state.

¶36     It is true, with regard to UCC security interests, that the local law to be followed in perfecting the interest is the state where "a debtor is located." Section 30-9A-301(1), MCA. As explained above, however, agricultural liens are not security interests. A separate provision of the UCC designates the local law to be followed when perfecting agricultural liens, indicating that the law of the state where "farm products are located" must govern. *See* § 30-9A-302, MCA. When Capital Harvest's lien was created, the sugar beets were located in Montana, and therefore, Montana was the "local law" designated by the UCC to govern perfection of the lien.

¶37    It has been explained that, technically, with the enactment of Revised Article 9, "there are now two local laws governing perfection in Montana"—Title 71 and the UCC. Burnham, 63 Mont. L. Rev. at 106.  However, regardless of which of these two local laws govern, the "practice would not change . . . for agricultural liens follow the location of the farm products, not the location of the debtor."  Burnham, 63 Mont. L. Rev. at 109. Further, with regard to Stockman Bank's claim as to the proper place of filing, there is no conflict between these two "local laws" as they existed at the time this case arose. Revised Article 9 provides that "if the local law of this state governs perfection of a security interest or agricultural lien, the office in which to file a financing statement to perfect the security interest or agricultural lien is: . . . (b) the office of the secretary of state . . . ."  Section 30-9A-501(1), MCA.  This is consistent with Title 71, which likewise provides that fertilizer and pesticide liens are to be "filed in the office of the secretary of state."  Sections 71-3-902(1) and 71-3-125(1), MCA.    Thus, the UCC did not require Capital Harvest to perfect its lien under the laws of North Dakota, as Montana law governs perfection and priority issues, consistently requiring filing with the Secretary of State, where Capital Harvest filed its agricultural lien statement.

***Perfection under the UCC—Sufficiency of the filing document***

¶38    We now turn to Capital Harvest's argument that its filing of an agricultural lien statement with the Montana Secretary of State, pursuant to § 71-3-125, MCA, also satisfied Revised Article 9's requirements for filing a UCC financing statement to perfect an agricultural lien.

21

¶39     Section 30-9A-502, MCA, provides: "[A] financing statement is sufficient only if it: (a) provides the name of the debtor; (b) provides the name of the secured party or a representative of the secured party; and (c) indicates the collateral covered by the financing statement."  In comparison, a Title 71 agricultural lien statement not only includes the information required on a UCC financing statement—the name of the debtor, the name of the secured party or a representative of the secured party, and the collateral covered by the financing statement—but also requires that the statement be signed by the lienor, describe the service or product furnished, state the county in which the farm products are located, and state other details with regard to the particular type of agricultural lien being filed.  *See* § 71-3-125, MCA.  Moreover, the information provided by the Title 71 agricultural lien statement is filed in the same centralized computer system as a UCC financing statement.  Indeed, § 71-3-125, MCA, which governs the filing of agricultural lien statements, was amended in 1999 by Senate Bill 153—the same bill that enacted Revised Article 9—to provide that the Montana Secretary of State shall "record the agricultural lien statement on the centralized computer system as set forth in [UCC provision] 30-9A-502."  Section 71-3-125(4)(a), MCA.

¶40     As we have noted, perfection is the process a creditor uses to establish its priority in relation to other creditors of the debtor in the same collateral by giving notice of its interest.  Moreover, "[t]he main reasons for including agricultural liens within the scope of Revised Article 9 were to require these interests to be publicly known through an Article 9 filing and to curb 'secret liens.'"  Pullen, 40 Tex. J. Bus. L. at 15.  This interest was pursued in Montana by requiring that agricultural liens be filed in the same

22

depository as documents perfecting other secured interests. Capital Harvest filed a Title 71 lien statement, containing all of the information required in a UCC financing statement and more, which was placed in the same centralized computer system as a UCC financing statement would have been placed. The notice purpose was thus fulfilled by Capital Harvest's filing, and no further purpose would have been served had Capital Harvest also filed a duplicative UCC financing statement.

¶41 Duplicative filing is an unwelcome burden which should not be required unless necessary. *See DeVoe v. Dept. of Revenue,* 263 Mont. 100, 115, 866 P.2d 228, 238 (1993) (requiring a party to "exhaust more administrative remedies than he has already exhausted would be a useless act, and neither law nor equity require useless acts"). Stockman Bank has not demonstrated that it was prejudiced by the lack of duplicate filings, as it clearly had notice of Capital Harvest's agricultural lien. Thus, we conclude that Capital Harvest's filing of the agricultural lien statement pursuant to § 71-3-125, MCA, also satisfied the financing statement requirements of Revised Article 9, and a duplicative filing was not required.

### Revenue from sale of the sugar beets

¶42 Having concluded that Capital Harvest's agricultural lien was properly perfected as required by the UCC, we now consider Stockman Bank's argument that, nonetheless, Capital Harvest had no claim to the checks deposited with the District Court representing proceeds from the sale of the sugar beets. Citing the agricultural lien statute, Stockman Bank argues that Capital Harvest only had a lien upon "grains or crops dusted or sprayed" and not upon the proceeds from sale of those crops. Stockman Bank thus

23

contends that although Capital Harvest may have had a superior or "superpriority" lien against the sugar beets themselves, it is not entitled to the funds at issue here.

¶43 Section 30-9A-315(1)(b), MCA, provides that "a security interest attaches to any identifiable proceeds of collateral." Noticeably absent from this provision is any reference to attachment of an agricultural lien to proceeds from collateral. Comment 9 to this section solidifies this negative inference, explaining that "[t]his Article [Title 30, Chapter 9A] does not determine whether a lien extends to proceeds of farm products encumbered by an agricultural lien." Likewise, comment 2 of § 30-9A-302, MCA, provides that "[i]nasmuch as no agricultural lien on proceeds arises under this Article, . . . this section does not expressly apply to proceeds of agricultural liens." Rather, this comment further explains that "if another statute creates an agricultural lien on proceeds, it may be appropriate for courts to apply the choice-of-law rule in this section to determine priority in the proceeds." Section 30-9A-302, MCA, cmt 2.

¶44 These statutes and comments illustrate that Revised Article 9 leaves to other law, namely, the statute under which an agricultural lien is created, to determine whether an agricultural lien extends to proceeds. In this case, § 71-3-901, MCA, does *not* extend to an agricultural supplier the right to a lien on the proceeds from the sale of liened farm products. While the statute provides for a lien upon "all grains or crops dusted or sprayed," it does not expressly grant Capital Harvest a lien on the proceeds from sale of those grains or crops. Section 71-3-901, MCA.

¶45 Although this agricultural lien statute does not extend the lien to proceeds of the collateral, § 30-9A-315(1)(a), MCA, does provide that "a security interest or agricultural

24

lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien." Thus, an agricultural lien remains attached to the collateral even after its sale or transfer. Consistent therewith, Title 71 provides that a buyer of farm products takes them free of an agricultural lien *unless* "a statement of an agricultural lien has been filed in the office of the secretary of state as provided in this chapter," or, in other words, has been perfected. Section 71-3-125(1), MCA. Consequently, when an agricultural lien statement has been properly perfected, as Capital Harvest has accomplished here, the lien remains attached to the products until the secured party has released its lien. The record in this case makes no mention of Capital Harvest releasing its agricultural lien in the sugar beets sold by Hardy Farm to Holly Sugar and Sidney Sugars, Inc. Therefore, while Capital Harvest may not have had a lien on the proceeds from the sale of the farm products, its lien on the farm products continued after they were sold.

### *Enforcement of continued lien*

¶46    "The rights of a secured party to enforce its security interest in collateral after the debtor's default are an important feature of a secured transaction." Section 30-9A-601, MCA, cmt. 2. Comment 7 of the Official Comments to § 35-9A-601, MCA, explains that "[Title 30, chapter 9A, part 6] provides parallel treatment for the enforcement of agricultural liens and security interests," and, in turn, § 30-9A-601(1)(a), MCA, provides that "[a] secured party may reduce a claim to judgment, foreclose, or otherwise enforce the claim, security interest, or agricultural lien by any available judicial procedure." Title

71 also recognizes the right of an agricultural lien holder to pursue judicial enforcement and requires an "owner of the property against which a lien is filed" to also pay the lienholder's costs and attorney fees even if the owner "pays the underlying claim before an action is filed on that claim or to foreclose the lien." Section 71-3-131(2), MCA. Thus, the right to judicially enforce or foreclose an agricultural lien is not lost upon sale or transfer of the products.

¶47 As explained, Capital Harvest's agricultural lien continued on the sugar beets even though they were purchased by Holly Sugar and Sidney Sugars, Inc. Consequently, Capital Harvest retained the ability to foreclose its lien through "any available judicial procedure" against these buyers. Section 30-9A-601(1)(a), MCA. In apparent recognition of these principles, Holly Sugar and Sidney Sugars, Inc., issued checks which were made jointly payable to Stockman Bank and Appellees, including the lienholder here, Capital Harvest. In doing so, the buyers honored Capital Harvest's agricultural lien, and Capital Harvest's unconditioned negotiation of the check acknowledged satisfaction and release of its lien.

¶48 **Did the District Court err in granting summary judgment to Appellees because an inchoate lien cannot be assigned and filed by the assignee?**

¶49 An understanding of this issue requires additional discussion of the background of this litigation. In addition to raising the procedural challenges to Capital Harvest's lien which we have addressed above, Stockman Bank also asserted that, in any event, Capital Harvest was not an entity eligible to claim and file a lien under Title 71. In the District Court, a virtual blizzard of financial documents was discovered, expert testimony was offered by both sides, and extensive arguments were made regarding the nature of the

26

transaction between AGSCO and Capital Harvest in order to determine Capital Harvest's status. Stockman Bank's argument is that the separate accounting systems of these separate corporations and the details of the transaction between them, including an exchange of intercompany payables and receivables, illustrate that Capital Harvest was not acting as an agent for AGSCO, that this transaction was not a simple pass-through transaction between allied entities, and it was not a limited assignment for collection purposes only. Rather, it urges that the transaction must be defined as a loan transaction between the entities involving a full, non-recourse assignment. Thus, it argues that Capital Harvest filed the lien, not on behalf of AGSCO, the agricultural supplier, but on its own behalf as financer. However, not being an agricultural supplier, Capital Harvest therefore had no right under Title 71 to file the lien. Further, Stockman Bank argues that inchoate, or unperfected, liens are not assignable, and therefore, any argument that AGSCO had assigned its lien rights to Capital Harvest must fail as a matter of law. Alternatively, Stockman Bank argues that this case should be remanded for a trial on Capital Harvest's status.

¶50 Appellees respond that AGSCO clearly was eligible under Title 71 to file an agricultural lien and that all actions by Capital Harvest were taken in an agency capacity for AGSCO, noting that the lien itself indicates that the filing was by Capital Harvest "as agent for AGSCO, Inc." Appellees point to the written agency agreement between the two entities and affidavit testimony to argue that Capital Harvest filed the lien as AGSCO's agent or, alternatively, that this was a pass-through transaction between related entities constituting a limited assignment for collection purposes only, with AGSCO

27

retaining its right to payment. Further, Capital Harvest urges that even if Stockman

Bank's evidence was sufficient to demonstrate this transaction was a full assignment

supported by consideration, inchoate lien interests are nonetheless assignable.

¶51   The District Court concluded:

> Stockman Bank does not provide any convincing legal authority that the
> accounting practices of Agsco and Capital Harvest establish an assignment
> as a matter of law. The accounting treatment of the Hardy Farms account
> demonstrates that [th]is was a pass-through transaction for collection
> purposes only, not a sale from Agsco to Capital Harvest (citation omitted).
> Even if an assignment occurred, there is no basis in Montana law, or the
> more persuasive authority from other jurisdictions cited by Agsco and
> Capital Harvest, to deny an assignee the ability to perfect the lien and
> enforce it in its own name. . . . The two old cases cited by Stockman Bank
> were decided before the pesticide lien statutes were enacted and therefore
> they did not address the precise legal issue here. Better-reasoned authority
> from other jurisdictions is that a statutory lien right can be freely assigned
> prior to perfection.

Similar to the District Court, we conclude that this case is best resolved on the issue of

the assignability of inchoate lien interests, which has been fully briefed by the parties on

appeal.[8]

¶52   Citing *Thompson v. Twodot Fertilizer Co.*, 71 Mont. 486, 492-93, 230 P. 588, 591

(1924), and *Mason v. Germaine*, 1 Mont. 263 (Mont. Terr. 1870), Stockman Bank

contends that, contrary to the conclusion of the District Court, Montana has long

followed the rule that the right to assert a lien is personal and cannot be assigned,

although it may be assigned after the actual supplier has perfected the lien. Stockman

---

[8]The Supreme Court of North Dakota held that the evidence led "to but one conclusion that Capital Harvest was an actual agent of AGSCO for purposes of collecting AGSCO's account receivables and had authority to file an agricultural supplier's lien as an agent for AGSCO." *Stockman Bank*, 728 N.W.2d at 149.

28

Bank further contends that if it is desirable for an assignee to have the right to perfect a lien claim, such a right should be granted by legislative action, not this Court.

¶53     Appellees maintain that Montana law did not prevent AGSCO from assigning or Capital Harvest, as assignee, from perfecting the inchoate lien. Appellees contend that neither *Thompson* nor *Mason* holds that an inchoate lien cannot be assigned, because in neither case was this precise legal issue present. Thus, Appellees argue that because language within those cases is dicta, this Court is free to adopt better reasoned authority. As such, they argue this Court should look to the persuasive authority from other jurisdictions and adopt the position that is better suited and more compatible with the purpose of the agricultural lien statute at issue as well as other Montana statutes: promoting the free transferability of property rights.

¶54     The question we must therefore address is whether, before it has reached the status of a perfected lien, the assignment of a claim for services performed or materials furnished will confer upon the assignee the right to perfect such claim. In this regard, we conclude that *Thompson* and *Mason* are not controlling. Appellees correctly note that in *Thompson* the assignor perfected his lien prior to assigning it; therefore, the issue raised here was not factually presented. *Thompson*, 71 Mont. at 488-89, 230 P. at 589. In *Mason*, the territorial court was unclear about the precise legal issue before the court and the factual background. While the opinion asserts that one of the issues involved "the assignment of McKillican's lien to plaintiff," nowhere in the opinion does the court address the circumstances surrounding the actual assignment between the parties so that the factual posture of the case can be determined. *Mason*, 1 Mont. at 271-72. Thus, a

prohibition against assignment of inchoate liens has not been clearly established in our law.

¶55     Montana's general view of assignment is that "[p]roperty of any kind may be transferred, except as otherwise provided in this part." Section 70-1-503, MCA. Section 28-1-1001, MCA, provides that "[a] right arising out of an obligation is the property of the person to whom it is due and may be transferred as such." Likewise, § 30-2-210, MCA, within UCC Sales provisions, states:

> (2) Unless otherwise agreed all rights of either seller or buyer can be assigned except when the assignment would materially change the duty of the other party, or increase materially the burden or risk imposed on the other party by the contract, or impair materially the other party's chance of obtaining return performance. A right to damages for breach of the whole contract or a right arising out of the assignor's due performance of the assignor's entire obligation can be assigned despite agreement otherwise.
>
> (3) The creation, attachment, perfection, or enforcement of a security interest in the seller's interest under a contract is not a transfer that materially changes the duty of or increases materially the burden or risk imposed on the buyer . . . .

These statutes further support Montana's general policy of promoting the free assignability of rights and obligations stemming from contractual obligations.

¶56     Authority from our sister states also recognizes the principle that an assignee acquires the right to perfect and enforce a lien. The Wyoming Supreme Court, in holding that the assignee of claims for labor or materials acquires the right to maintain an action upon the assigned claim against the surety on the bond of the contractor, acknowledged:

> The general policy of the law in creating the lien is to protect the laborer or materialman to the end that he may receive full compensation for the labor or material so furnished and which has gone into the construction of the road. To allow the assignee to perfect the lien does the debtor no harm. He owes the debt and the funds are held by him subject to the right to fix the lien. It is of no concern to him who fixes it. On the other hand, it is of material advantage to the laborer or materialman that he be allowed to collect his claim as quickly as possible and that he receive full value therefor. If he be denied the privilege of assigning his

30

equitable right to fix the lien along with his debt, it will often result that he must either suffer the delay and expense incident to fixing the lien or else assign his claim at a discount and suffer the loss. He should be permitted to avail himself of the security which the statute gives him in the way most beneficial to himself, and, if he can better himself, without injury to the debtor, by giving his assignee the right to perfect the lien, he should be permitted to do so.

*Shoshoni Lumber Co. v. Fidelity & Deposit Co. of Maryland,* 24 P.2d 690, 699 (Wyo. 1933) (quoting *Southern Sur. Co. of New York v. First State Bank of Marquez*, 54 S.W.2d 888, 890 (Tex.Civ.App. 1932)). The Wyoming Supreme Court added:

[T]he weight of authority as well as the better reason is in favor of the assignability. . . . We can see no reason why the lien should not pass in equity with the debt or contract while it remains inchoate as readily as after it is consummate. It exists in right before the filing of the claim, adding to its value, and it is no more than equitable, for the sake of both assignor and assignee, that it should pass, to be perfected by the assignee in the name of the assignor.

*Shoshoni Lumber Co.*, 24 P.2d at 698 (quoting *J.J. McDonald & Co. v. Kelly*, 14 R.I. 335 (R.I. 1884)).

¶57 Mechanics' liens and surety cases have a similar, if not identical, purpose to the agricultural lien: to protect laborers and suppliers by providing them with a form of security to insure they are paid. Stockman Bank nonetheless contends that the lien is a purely personal privilege and cannot be assigned. We determine, however, where the statute is silent on this point, as is § 71-3-901, MCA, the weight of persuasive authority as well as better reasoning favor assignability. The agricultural lien is a security, and, by analogy to other securities, it ought to follow the debt or contract to which it pertains.

¶58 Stockman Bank insists, however, that "these agricultural liens are typically filed by the actual suppliers in relatively minor dollar amounts. Agricultural liens are intended to protect the likes of small local crop dusters, not large companies that recklessly finance $500,000 in chemical purchases made by a struggling farmer, unbeknownst to the bank."

31

While we recognize that AGSCO is not a small supplier—here selling $500,000 worth of chemicals—it is important to recognize the purposes behind § 71-3-901 et seq., MCA, and to adhere to intent of the Legislature. Stockman Bank may be correct in that certain companies may recklessly finance large sums of money and then seek recovery through the agricultural lien process. However, the Legislature did not place restrictions on the size of the company using agricultural liens, and with regard to the amount of the lien, the only restriction is that "[a] lien may not exceed the prevailing price charged in the particular locality in which the grain or crops are sprayed or dusted." Section 71-3-901, MCA. This restriction is not at issue here.

¶59 We conclude that the free assignability of the right to perfect an agricultural lien under Title 71 comports with the purposes of the lien statutes, as well as modern business practice. *Shoshoni Lumber Co.*, 24 P.2d at 697. We therefore further conclude that even though AGSCO's agricultural lien was not yet perfected when transferred to Capital Harvest, it was assignable, and Capital Harvest validly proceeded to perfect and enforce the lien.

## SUMMARY AND CONCLUSION

¶60 Attachment of an agricultural lien is accomplished pursuant to the agricultural lien statutes, § 71-3-901 et seq., MCA. Section 71-3-902(2), MCA, did not require Capital Harvest to give advance notice to Hardy Farm of its intention to file a lien. To be perfected for purposes of obtaining priority over UCC secured interests in the same collateral, an agricultural lien must satisfy both Title 71 and UCC perfection requirements. Under "current law," meaning the 2001 Montana Code Annotated

32

applicable to this transaction, the perfection requirements of Revised Article 9 of the UCC were satisfied by the filing of the agricultural lien statement in the same centralized computer system with the Montana Secretary of State. Although an agricultural lien does not attach to proceeds from sale of liened collateral, a buyer takes the crops subject to the agricultural lien unless there has been a release by the lienholder, and, if no such release has been given, the lienholder may pursue judicial remedies against the buyer to foreclose the lien. Here, however, the lien was satisfied by issuance of payment in the name of Capital Harvest, and Capital Harvest's negotiation thereof. The law allows the assignment of inchoate, or unperfected, agricultural lien interests, and thus, Capital Harvest, either as agent or as assignee, was entitled to file and perfect the agricultural lien. Capital Harvest was thus entitled to the funds in the amount stipulated by the parties and ordered by the District Court as payment of its charge for chemicals sold by AGSCO to Hardy Farm and applied to sugar beets in Montana in 2002, and to the interest on the funds deposited with the District Court to be credited on such sum.

¶61 The District Court correctly granted summary judgment to Appellees and did not abuse its discretion by denying Stockman Bank's motion to alter or amend the judgment.

¶62 Affirmed.

/S/ JIM RICE


We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ JOHN WARNER