

DA 09-0336

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2010 MT 81

---

IN THE MATTER OF

K.M.G.,

A Youth Under the Age of Eighteen.

---

APPEAL FROM:     District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DJ 08-20
Honorable Edward P. McLean, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Joslyn M. Hunt, Chief Appellate Defender; Tammy A. Hinderman,
Jennifer A. Hurley, Assistant Appellate Defenders; Helena, Montana

For Appellee:

Hon. Steve Bullock, Montana Attorney General; Sheri K. Sprigg,
Assistant Attorney General; Helena, Montana

Fred Van Valkenburg, Missoula County Attorney; Missoula, Montana

---

Submitted on Briefs:  February 17, 2010

Decided:  April 20, 2010

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 K.M.G. appeals from the Youth Court's disposition adjudging him a Delinquent Youth and sentencing him to the Department of Corrections for placement at the Pine Hills Youth Correctional Facility (Pine Hills). We affirm.

¶2 We state the issues as follows:

¶3 1. Did the Youth Court err by committing K.M.G. to the Department of Corrections for placement at Pine Hills pursuant to § 41-5-1513, MCA (2007)?

¶4 2. Did the Youth Court err by failing to specify how long K.M.G. could be placed at Pine Hills?

¶5 3. Did the Youth Court err by finding that K.M.G. admitted to failing to attend school in violation of his probation?

## FACTUAL AND PROCEDURAL BACKGROUND

¶6 Appellant K.M.G. is a fourteen-year-old boy currently placed at Pine Hills for committing a string of misdemeanor crimes, including assault, disorderly conduct, resisting arrest and two counts of theft. K.M.G. also admitted to violations of probation previously imposed by the Youth Court.

¶7 On January 8, 2008, 12-year-old K.M.G. approached a fellow student at Meadow Hill School from behind and punched him in the back. The victim suffered discomfort and redness in his middle spine area and could not walk for some time without pain. When the responding officer called K.M.G.'s mother to set up a meeting regarding the assault, she yelled at the officer and eventually hung up on him. When the principal called K.M.G. into his office, K.M.G. was rude and refused to sit down as requested.

2

K.M.G.'s mother displayed similar verbally-assaultive behavior to the principal as K.M.G.

¶8 On January 21, 2008, K.M.G.'s mother contacted law enforcement to report that K.M.G. had called her demeaning names and had left the residence without her permission, a problem she described as on-going. On January 28, 2008, security officers caught K.M.G. stealing two laser pointers from a store in Southgate Mall.

¶9 Citing these incidents, the State filed a Petition to declare K.M.G. a Delinquent Youth. Before the Petition was served, K.M.G. committed additional crimes. The State subsequently amended the petition to allege another assault, sexual intercourse without consent, misdemeanor sexual assault, criminal mischief, and disorderly conduct.

¶10 On April 9, 2008, K.M.G. admitted to the theft and assault charges alleged in the original petition. On July 16, 2008, K.M.G. admitted to the disorderly conduct charge as part of a deferred prosecution agreement under which the State agreed to dismiss, without prejudice, the remaining counts of the amended petition, which were then dismissed by the Youth Court.

¶11 The Youth Court held a dispositional hearing on November 12, 2008. The court assumed jurisdiction over K.M.G. until his eighteenth birthday, and ordered out-of-home placement for K.M.G. at the Dennis Radtke Home for Boys (Radtke Home) for treatment, followed by six months of formal probation. The court imposed probation conditions, including that K.M.G. obey all laws, attend school regularly, reside at the Radtke Home and keep the Home advised of his whereabouts at all times. After K.M.G.

3

was taken to the Radtke Home, he immediately ran from the home without permission, violating his probation.

¶12   The next day, November 18, 2008, law enforcement responded to a report of a shoplifting in progress at a Shopko store. K.M.G. and another individual had been temporarily detained by Shopko store security for theft of a backpack, but had fled. Law enforcement officers located the juveniles behind a shed, and detained them. Missoula Police Officer Erbacher instructed K.M.G. to sit on the ground while he gathered information. He learned that K.M.G. had run from the group home, and that the Youth Court had ordered that K.M.G. be detained. Officer Erbacher became concerned with K.M.G.'s behavior, believing that K.M.G. intended to run. Officer Erbacher instructed K.M.G. to stand up and place his hands behind his back. K.M.G. did so, but when Officer Erbacher attempted to grab his wrist, K.M.G. bolted and attempted to escape by running down an alley. Officer Erbacher stopped K.M.G., but K.M.G. resisted and caused injury to Officer Erbacher.

¶13   In response to this criminal activity, the State filed a second petition to declare K.M.G. a Delinquent Youth. The Youth Court set a bond for detaining K.M.G., which K.M.G.'s mother posted. The release conditions required K.M.G. to abide by the previously imposed conditions, which he failed to do. Between his release on December 1, 2008, and December 11, 2008, K.M.G. failed to attend school, was allowed to remain unsupervised at home for several days, and tested positive for prescription narcotic benzodiazepines after a mandatory probationary urinalysis. School officials observed

4

minor injuries on K.M.G., which they surmised were caused from a fight. The State also filed a petition to revoke K.M.G.'s probation.

¶14 On January 9, 2009, K.M.G. admitted the second theft and resisting arrest charges and admitted leaving the Radtke Home without permission in violation of his probation. The Youth Court entered K.M.G.'s admissions, and scheduled a dispositional hearing. In the interim, K.M.G. continued to violate his probationary conditions. Instead of residing with his aunt in Helena, as ordered by the Youth Court, K.M.G. returned to his mother's home in Missoula. K.M.G.'s juvenile probation officer learned of his whereabouts when K.M.G.'s mother called three days before the disposition hearing to advise that K.M.G. was "out in the alley . . . intoxicated." The next day, after the juvenile probation officer told K.M.G. that he must remain with his mother at all times until the court hearing, K.M.G. told his mother he "didn't like those rules," and left home.

¶15 K.M.G. was subsequently evaluated by Eileen C. Robbins, an Advanced Practice Registered Nurse with the Western Montana Mental Health Center, Child and Family Service Network. Robbins recommended that K.M.G. "attend treatment at a facility where he can receive long-term intensive treatment . . . ." However, due to funding limitations, it became clear that out-of-home community placement for K.M.G. was not an option, and that he would either be placed at Pine Hills or returned to his mother's home. In light of this development, Robbins filed an addendum to her report, stating "[if] treatment could be provided to [K.M.G.] while at Pine Hills Correctional Facility, that would be an option which could be helpful to [K.M.G.], certainly more helpful than returning him to his mother's home."

5

¶16 On April 8, 2009, the Youth Court held a dispositional hearing on K.M.G.'s probation violations and the new theft and resisting arrest charges. The State recommended the Youth Court commit K.M.G. to the Department of Corrections for placement at Pine Hills. Defense counsel recommended that the court place K.M.G. on probation, and return him to his mother's care on the condition that he "complete counseling with Eileen Robbins." Defense counsel stated that he understood Robbins's recommendation was to "send [K.M.G.] straight to Pine Hills" but, noting Robbins's willingness to treat K.M.G. if he was in Missoula, argued for probation, given that K.M.G. "would be under the understanding that if he is given probation, he is on a no-tolerance release. Any violation is going to send him to Pine Hills."

¶17 The Youth Court adjudicated K.M.G. a Delinquent Youth. Concluding that the commitment requirements of § 41-5-1513(1)(b), MCA, had been satisfied, the court ordered K.M.G. "committed to the custody of the Department of Corrections until he reaches the age of 18 years or sooner released by the Department of Corrections." Addressing K.M.G., the court stated that the

> reason for the judgment is that you have demonstrated, from your prior behavior, that you cannot reside in the community while on a probationary status. You refuse to abide by the conditions of probation. Your mother refuses to make you abide by the rules of probation. We've tried you with your aunt in Helena. She cannot be relied upon to have you under her control. There, virtually, is no further placement for you in the Missoula community. It's necessary that you be removed from the community, and placed at a secure facility for treatment. And, in that way, it's hopeful that you'll acquire some of the means necessary for your rehabilitation.

¶18 K.M.G. appeals.

6

**STANDARDS OF REVIEW**

¶19 We conduct de novo review of the youth court's conclusions of law to determine whether those conclusions are correct. *In re C.D.H.*, 2009 MT 8, ¶ 21, 349 Mont. 1, 201 P.3d 126 (citing *LHC, Inc. v. Alvarez*, 2007 MT 123, ¶ 13, 337 Mont. 294, 160 P.3d 502; *State v. Hastings*, 2007 MT 294, ¶ 8, 340 Mont. 1, 171 P.3d 726). We generally will not review an issue to which the appealing party failed to object in the trial court. *State v. Kotwicki*, 2007 MT 17, ¶ 8, 335 Mont. 344, 151 P.3d 892 (citing *State v. Lenihan*, 184 Mont. 338, 341, 602 P.2d 997, 999 (1979)). However, an exception to the rule "allows appellate review of a criminal sentence that is alleged to be illegal or in excess of statutory mandates, even if the defendant raised no objection in the trial court." *Kotwicki*, ¶ 8 (citing *Lenihan*, 184 Mont. at 343, 602 P.2d at 1000). Generally, we review a sentence's legality to determine "whether it is within the statutory parameters." *State v. Herman*, 2008 MT 187, ¶ 11, 343 Mont. 494, 188 P.3d 978 (citations omitted). A sentencing court's failure to abide by a statutory requirement may constitute an objectionable sentence, but not necessarily an illegal one permitting the *Lenihan* exception to be invoked on appeal. *Kotwicki*, ¶ 13 (citing *State v. Nelson*, 274 Mont. 11, 20, 906 P.2d 663, 668 (1995); *State v. Swoboda*, 276 Mont. 479, 482, 918 P.2d 296, 298 (1996)).

**DISCUSSION**

¶20 *1. Did the Youth Court err by committing K.M.G. to the Department of Corrections for placement at Pine Hills pursuant to § 41-5-1513, MCA?*

¶21 K.M.G. contends that the Youth Court did not have statutory authority to commit him to the Department of Corrections, for placement at Pine Hills, because none of the three statutory criteria for such placements were satisfied in his case. Section 41-5-1513(1)(b)(i)-(iii), MCA, provides:

> The court may not place a youth adjudicated to be a delinquent youth in a state youth correctional facility for an act that would be a misdemeanor if committed by an adult unless:
> (i) the youth committed four or more misdemeanors in the prior 12 months;
> (ii) a psychiatrist or a psychologist licensed by the state or a licensed clinical professional counselor or a licensed clinical social worker has evaluated the youth and recommends placement in a state youth correctional facility; and
> (iii) the court finds that the youth will present a danger to the public if the youth is not placed in a state youth correctional facility.

¶22 We address K.M.G.'s arguments under each of the three criteria in turn.

¶23 *a. Did K.M.G. commit "four or more misdemeanors in the prior 12 months" under subsection 1513(1)(b)(i)?*

¶24 K.M.G. contends that he did not commit the requisite four misdemeanors "in the prior 12 months." He argues that, under the language of the statute, the 12-month period "runs from the date of the disposition hearing or the time at which the youth court commits the youth to the Department of Corrections." The Youth Court's disposition was not made until April 8, 2009, and K.M.G. thus argues that he cannot be placed at Pine Hills because he did not commit four misdemeanors during the 12 months preceding

8

that date.[1]  K.M.G. also contends that his interpretation is consistent with the legislative intention to limit, not expand, the youth court's ability to incarcerate delinquent youth.

¶25    The State responds that K.M.G.'s interpretation of the statute is "patently absurd" because "[i]t would allow a youth to control the disposition options available to the youth court by deliberately delaying the disposition of his case."  The State offers that the "prior 12 months" requirement must be interpreted to mean the 12-month period prior to the State's filing of the adjudication petition charging the youth with committing the misdemeanors.  Under this interpretation, the State argues that all five of K.M.G.'s misdemeanor crimes counted for purposes of § 41-5-1513(1)(b)(i), MCA, because K.M.G. committed them within the 12 months preceding the State's filing of the delinquency petition on November 26, 2008.

¶26    When interpreting a statute, we seek to implement the intention of the legislature. Section 1-2-102, MCA; *Mont. Vending, Inc. v. Coca-Cola Bottling Co.*, 2003 MT 282, ¶ 21, 318 Mont. 1, 78 P.3d 499 (citations omitted).  To determine legislative intent, we look first to the plain meaning of the words of the statute.  *State v. Trull*, 2006 MT 119, ¶ 32, 332 Mont. 233, 136 P.3d 551 (citations omitted).  We are to neither insert that which has been omitted, nor omit that which has been inserted.  Section 1-2-101, MCA; *Druffel v. Bd. of Adjustment*, 2007 MT 220, ¶ 16, 339 Mont. 57, 168 P.3d 640.  Statutory construction should not lead to an absurd result if a reasonable interpretation can avoid it. *Van Der Hule v. Mukasey*, 2009 MT 20, ¶ 10, 349 Mont. 88, 217 P.3d 1019 (citing *State*

---

[1]  Again, K.M.G.'s misdemeanors were committed on January 8, 2008;  January 26, 2008; March 5, 2008; and two on November 18, 2008.

*v. Letasky*, 2007 MT 51, ¶ 11, 336 Mont. 178, 152 P.3d 1288).  When the intent of the legislature cannot be determined from the plain language of the statute, we examine the statute's legislative history to determine its correct interpretation.  *State v. Merry*, 2008 MT 288, ¶ 17, 345 Mont. 390, 191 P.3d 428 (citing *Stockman Bank of Mont. v. Mon-Kota, Inc.*, 2008 MT 74, ¶ 17, 342 Mont. 115, 180 P.3d 1125); *see Montanans for Justice v. State*, 2006 MT 277, ¶ 60, 334 Mont. 237, 146 P.3d 759, ("When the legislative intent cannot be readily derived from the plain language, we review the legislative history and abide by the intentions reflected therein.").

¶27     Section 41-5-1513(1)(b)(i), MCA, provides that the youth court "may not place a youth adjudicated to be a delinquent youth in a state youth correctional facility for an act that would be a misdemeanor . . . unless: (i) the youth committed four or more misdemeanors in the prior 12 months."  K.M.G. reads this provision as requiring "four or more misdemeanors in the prior 12 months *preceding the final disposition*."  The State reads it as requiring "four or more misdemeanors in the prior 12 months *preceding the filing of the delinquency petition*."  Both suggestions, however, raise the specter of adding language to the statute.  The provision raises further ambiguity:  did the legislature intend to authorize facility placement of delinquent youth who commit at least four misdemeanors in a 12 month period, or only when youth commit at least four misdemeanors in the 12-month period "prior to" the current misdemeanor for which he is being disposed—in other words, requiring at least five misdemeanors?

¶28     Because the provision is "reasonably susceptible" to more than one interpretation, *Gannett Satellite Info. Network, Inc. v. State*, 2009 MT 5, ¶ 27, 348 Mont. 333, 201 P.3d

10

132, we conclude that it is ambiguous and turn to the legislative history for assistance in determining the legislature's intent. *Mont. Vending*, ¶ 21 (citations omitted). In the 2003 Legislative session, Representative Gary Matthews introduced H.B. 156 to amend § 41-5-1513, MCA, and the original intent, as explained by Representative Matthews, was to prevent the placement of youths who had committed a misdemeanor in a correctional facility. Matthews explained to the House Judiciary Committee that the bill's purpose was to "eliminate a court's ability to place a youth adjudicated delinquent, for an act that would be a misdemeanor if committed by an adult, in a state youth correctional facility." He stated that "once a juvenile gets into the system, it is hard for them to get out of the system." Mont. H. Jud. Comm., *Hearing on HB 156*, 58th Leg., Reg. Sess. 2 (Jan. 15, 2003).

¶29 However, Representative Bob Clark inquired about what options would be available "for youths who commit many misdemeanors." Steve Gibson, the Juvenile Probation Officer Division Administrator, suggested an amendment be made to the bill "for multiple misdemeanor offenders." Mont. H. Jud. Comm., *Hearing on HB 156*, at 3-4. Thereafter, the language which would become subsection 1513(1)(b)(i) was first added to the bill by the House Judiciary Committee.

¶30 There was lively discussion about the multiple misdemeanor provision of the bill during the sessions of the Senate Judiciary Committee. Senator Jerry O'Neil questioned the propriety of incarcerating juvenile offenders who had committed "multiple shoplifting offenses." Representative Matthews responded that such minor offenders should not be placed in a facility, and suggested that Pine Hills be limited to juveniles such as "sex

11

offenders, gang members," and youths that had committed "many felonies." He further explained that "placement dollars are available for shoplifters" and juveniles committing minor offenses. Dick Meeker, of the Montana Juvenile Probation Officers Association, wrote that the "Association originally opposed this legislation because it left the youth court with no discretion in dealing with multiple misdemeanor offenders." He commended the multiple misdemeanor amendment, noting that "Youth Courts go to great lengths to keep juveniles from ever reaching a correctional facility but there are times when it is necessary because the community needs to be protected and the youth has not responded to other options."

¶31    About the number of misdemeanors necessary to authorize facility placement, Committee Chairman Duane Grimes observed that "[i]f a youth committed four misdemeanors, it may be necessary to have the youth sent to Pine Hills." Senator Dan McGee inquired whether "a fifth misdemeanor in a 12 month period" would "result in the youth being sent to Pine Hills." To this inquiry, Senator Mike Wheat stated his belief that "this could take place with the fourth misdemeanor" in a 12 month period. Sen. McGee then noted that there are youth who offend routinely and regularly and it is necessary the state have a hammer to address this situation. The Committee subsequently approved the language. Mont. Sen. Jud. Comm., *Hearing on HB 156*, 58th Leg., Reg. Sess. 6-14 (Mar. 10, 2003).

¶32    K.M.G. is correct that the legislative history reveals an intention by the Legislature to limit the number of juvenile offenders committed to Pine Hills for petty offenses. However, the history also clearly reveals that an exception to this general goal was

intended for juveniles who were multiple offenders—allowing facility placement, in the words of Senator Wheat, "with the fourth misdemeanor." This history reveals an intent to authorize, within the youth court's dispositional discretion, a facility placement of a juvenile brought before the court having committed four or more misdemeanors within a 12 month period of time. K.M.G. was brought before the Youth Court for disposition having committed his fourth and fifth misdemeanors within 12 months. As such, the Youth Court correctly determined that it was authorized, assuming the other criteria were met, to place K.M.G. within a youth facility for these offenses under subsection 1513(1)(b)(i).

¶33 ***b. Was K.M.G. evaluated by an appropriate professional under subsection 1513(1)(b)(ii)?***

¶34 K.M.G. asserts that the second prong of the statute has not been met because he was not evaluated by the proper mental health professional. The statute states that a youth is to be evaluated by "a psychiatrist or a psychologist licensed by the state or a licensed clinical professional counselor or a licensed clinical social worker" who must "recommend[] placement in a state youth correctional facility." Section 41-5-1513(1)(b)(ii), MCA. K.M.G. was evaluated by Eileen C. Robbins, an Advanced Practice Registered Nurse, who provided the following recommendations:

> Specifically, the likely placement options for [K.M.G.] include Pine Hills Correctional Facility or return to his mother's home. I feel strongly that [K.M.G.] needs treatment rather than simply correctional intervention. If treatment could be provided to [K.M.G.] while at Pine Hills Correctional Facility, that would be an option which could be helpful to [K.M.G.], certainly more helpful than returning him to his mother's home.

13

K.M.G. contends that Robbins does not satisfy the occupational requirements of the statute and, further, that she did not actually "recommend" K.M.G.'s placement at Pine Hills.

¶35 The State responds that K.M.G. waived these arguments by failing to object before the Youth Court, and in fact specifically acquiesced to the violations he now challenges. The State further argues that K.M.G.'s objections do not satisfy the *Lenihan* exception for raising issues on appeal without objection.

¶36 We generally will not review an issue to which a party has failed to object or otherwise preserve for appeal in the district court. The rationale is that the objecting party must give the trial court the opportunity to address and correct any perceived errors. We recognized an exception to this general rule in *Lenihan*, allowing appellate review of a criminal sentence that is alleged to be illegal or in excess of statutory mandates, even if the defendant raised no objection in the district court at the time of sentencing. *Lenihan*, 184 Mont. at 343, 602 P.2d at 1000. We have explained that the *Lenihan* exception allows appellate review of a criminal sentence "that is alleged to be illegal or in excess of statutory mandates." *Kotwicki*, ¶ 8. A criminal sentence is not illegal for purposes of the *Lenihan* exception "if it falls within statutory parameters." *Kotwicki*, ¶ 13 (citing *State v. Garrymore*, 2006 MT 245, ¶ 9, 334 Mont. 1, 145 P.3d 946). Thus, "a sentencing court's failure to abide by a statutory requirement rises to an objectionable sentence, not necessarily an illegal one that would invoke the *Lenihan* exception." *Kotwicki*, ¶ 13 (citing *Nelson*, 274 Mont. at 20, 906 P.2d at 668; *Swoboda*, 276 Mont. at 482, 918 P.2d at 298).

¶37 K.M.G. asserts that his claim that the Youth Court failed to have him evaluated by a proper mental health professional under § 41-5-1513(1)(b)(ii), MCA, is a statutory violation which renders his disposition illegal and appealable despite having failed to object, pursuant to the *Lenihan* exception. However, K.M.G.'s argument runs counter to the parameters of the *Lenihan* exception explained above, because his disposition fell within statutory parameters, as we have held in several similar cases. In *Nelson*, the defendant claimed that the district court failed to follow the mandates of §§ 46-18-201(10), -225, MCA, before sentencing him to prison, and that his sentence was thus illegal and appealable under *Lenihan*. *Nelson*, 274 Mont. at 17-18, 906 P.2d at 666-67. The statute required a sentencing court, prior to ordering incarceration, to first consider alternative placements. It provided that sentencing courts "*shall first consider* alternatives to imprisonment of the offender in the state prison," "*shall examine*" the statutory criteria for sentencing nonviolent offenders, and "*shall state* its reasons" for rejecting alternatives to imprisonment. Section 46-18-201(11), MCA (1995) (emphasis added). We rejected Nelson's *Lenihan* argument, reasoning that the district court's failure to satisfy the prerequisites to incarceration made the sentence "subject to challenge or objection," but did not render the sentence illegal because it was "not in excess of the maximum statutorily authorized." *Nelson*, 274 Mont. at 20, 906 P.2d at 668. We reached the same conclusion on a claim under the same statute in *Swoboda*, 276 Mont. at 482, 918 P.2d at 298.

¶38 In *Kotwicki*, we relied upon *Nelson* and *Swoboda* to reject a broader application of the *Lenihan* rule we had approved, without analysis, in *State v. McLeod*, 2002 MT 348,

15

313 Mont. 358, 61 P.3d 126. *Kotwicki*, ¶¶ 12-16. The statute at issue in *Kotwicki* mandated that the district court "*may not sentence* an offender to pay a fine" unless the court determined the offender had the financial ability to do so. Section 46-18-231(3), MCA (emphasis added). Though failing to object, Kotwicki argued his fine was illegal and appealable because of the sentencing court's failure to comply with this statutory requirement. However, we held that the issue was not reviewable under the *Lenihan* rule, reasoning that "Kotwicki's fine of $25,000 falls within the parameters of that statute, and thus Kotwicki's sentence is not an illegal sentence for the purposes of invoking the *Lenihan* rule." *Kotwicki*, ¶ 16.

¶39 K.M.G.'s argument that the Youth Court could not place him in Pine Hills because it failed to obtain an evaluation by the proper professional under the statute, thus rendering his sentence illegal and appealable, is similar to Kotwicki's argument that his sentence was illegal because the court could not impose a fine upon him without determining he had the ability to pay as required by statute. It is also similar to Nelson and Swoboda's arguments that their sentences were illegal because the courts could not incarcerate them without considering alternatives as required by statute. While the Youth Court's failure to comply with a statutory procedural requirement "rises to an objectionable sentence," it does not constitute an illegal sentence for purposes of *Lenihan*. *Kotwicki*, ¶ 13.

¶40 Beyond K.M.G.'s failure to object is his active acquiescence in the error during the sentencing hearing. K.M.G. understood Robbins's credentials, as well as her ultimate recommendation of placement and treatment at Pine Hills. Not only did he fail to object

16

to Robbins's involvement, he embraced it, arguing that the Youth Court should grant him probation and order him to undergo treatment with Robbins. K.M.G.'s counsel stated "I, also, note in Ms. Robbins' report, that she's willing to treat [K.M.G.] if he is out, and here in Missoula" and argued for the probationary treatment approach Robbins had initially recommended, prior to her learning that the approach would not be possible. "We will not put a district court in error for an action in which the appealing party acquiesced or actively participated." *State v. Micklon*, 2003 MT 45, ¶ 10, 314 Mont. 291, 65 P.3d 559 (citations omitted); *see also* § 1-3-207, MCA ("Acquiescence in error takes away the right of objecting to it."). This case well illustrates the reason for this rule. Allowing K.M.G. to challenge Robbins's involvement on appeal, after he had affirmatively embraced it before the Youth Court to tactically support his argument for probation, would sanction gamesmanship of the judicial system. A litigant could pursue one strategy in the trial court, only, if unsuccessful, to reverse course on appeal and challenge the court's failure to follow the very statute he had ignored as part of his trial strategy. K.M.G.'s actions constituted a waiver of that issue, and we decline to reach it.

¶41 **c. Was K.M.G. properly found to be a danger to the public under subsection 1513(1)(b)(iii)?**

¶42 K.M.G. acknowledges that the Youth Court found that he would present a danger to society in its written order, but contends that it did not discuss the evidence which supports this finding and, in fact, insufficient evidence existed to support the finding. The State again argues that K.M.G. waived this argument by failing to object and that,

17

even assuming *arguendo* the issue is properly before this Court, that substantial evidence supports the Youth Court's determination that K.M.G. was a danger to the public.

¶43 Even assuming no objection was necessary to preserve K.M.G.'s arguments, we believe the Youth Court's order was supported by sufficient evidence and adequately demonstrated K.M.G.'s dangerousness for purposes of the statute. When sentencing K.M.G., the Youth Court stated it was "necessary that [K.M.G.] be removed from the community, and placed at a secure facility for treatment." The Youth Court's amended dispositional order stated that the court had heard and considered the "recommendations for disposition from the Youth Court's Report to the Court, the Deputy County Attorney, the Youth's attorney and the Youth" and that it had "specifically reviewed the Report to the Court and attached Psychiatric Evaluation and Addendum to Psychiatric Evaluation" as the bases for its determination to place K.M.G. in a secure facility. This evidence revealed that K.M.G. had a history of non-compliance with parental, school, law enforcement and probationary rules and authority and had exhibited criminal and violent behaviors. The Youth Court's finding that K.M.G was "a danger to the public if not placed in a state youth correctional facility" was supported by substantial evidence and adequately discussed.

¶44 *2. Did the Youth Court err by failing to specify how long K.M.G. could be held at Pine Hills?*

¶45 The Youth Court committed K.M.G. "to the custody of the Department of Corrections until he reaches the age of 18 years or sooner released by the Department of Corrections." The Youth Court recommended that K.M.G. "be placed at Pine Hills

School for Boys." K.M.G. argues that the disposition was illegal because it failed to limit the maximum period of time he could be placed in Pine Hills. Because K.M.G. can only be incarcerated for the maximum period that could be imposed upon an adult convicted of the same offenses, pursuant to § 41-5-1522(1), MCA, he argues that the court's disposition is illegal and must be reversed. The State agrees that K.M.G. cannot be held by the Department of Corrections beyond the period of time an adult could serve for the same offenses, but argues that there was nothing illegal in leaving the specific determination of how long K.M.G. would be placed to the Department of Corrections.

¶46 K.M.G.'s placement to the Department of Corrections is indeed subject to the limitation that he "may not be held . . . for a period of time in excess of the maximum period of imprisonment that could be imposed on an adult convicted of the offense or offenses that brought the youth under the jurisdiction of the youth court." Section 41-5-1522(1), MCA. Procedurally, pursuant to § 41-5-1522, MCA, "[w]hen a youth is committed to the department [of corrections], the department shall determine the appropriate placement and rehabilitation program for the youth after considering the recommendations made by the youth placement committee." The Department of Corrections's Length of Stay Committee establishes a youth's "length of stay within 30 days of a youth's arrival at the facility." Admin. R. M. 20.9.703(1)(a) (2007). The committee determines the length of stay based upon several criteria, including the "delinquency history of the youthful offender; the severity and chronicity of the offenses committed by the youthful offender within the past 12 months; and mitigating or

19

aggravating circumstances surrounding the act for which the youth has been adjudicated."

Admin. R. M. 20.9.704(1)(a)-(c). Then, a youth must be discharged from a facility when:

> (a) the youth [has] attained age 18;
> (b) the court order committing the youth to the department has expired;
> (c) the youth is being prosecuted in criminal court as an adult; or
> (d) *the youth has served the maximum period of confinement pursuant to 41-5-1522, MCA*.

Admin. R. M. 20.9.707(2)(a)-(d) (underlining in original, emphasis added).

¶47    As evident from these provisions, the Department of Corrections may not detain a youth beyond the maximum period of confinement of the offenses he has committed. The Department of Corrections may not hold K.M.G. at Pine Hills Correctional Facility beyond the period of time an adult could serve for committing the same misdemeanor offenses for which he was disposed.

¶48    The Youth Court's disposition order was consistent with both § 41-5-1522, MCA, and Admin. R. M. 20.9.703, 704, 707, and did not err by leaving the specific calculation of K.M.G.'s placement time to the Department of Corrections under these provisions.

¶49    *3. Did the Youth Court err by finding that K.M.G. admitted to not attending school in violation of his probation?*

¶50    The Youth Court's disposition order states that K.M.G. admitted the allegations in the State's Amended Petition to Revoke, including that he violated the condition that he attend school on a regular basis. K.M.G. argues that he only admitted to running away from the Radtke Home, not that he failed to attend school regularly. K.M.G. directs our attention to the January 9, 2009 hearing, where he orally admitted running from the Radtke Home, in violation of his probation, and notes the Youth Court did not address

20

the school attendance violation.  The State contends that K.M.G. admitted to the truancy violation by way of the Juvenile Admission and Waiver of Rights form filed with the Youth Court.

¶51   K.M.G.'s signed Juvenile Admission and Waiver Form indicates that K.M.G. admitted to violating the condition that he attend school.  K.M.G. initialed every line of the document, indicating he understood his rights and making his admissions to the alleged probation violations.   In open court, K.M.G.'s counsel presented the signed Admission and Waiver Form, as evidenced by the record:  "We're prepared to enter admissions, today—both to two new charges filed against [K.M.G.], as well as the Petition to Revoke . . . .  If I can approach, I have a Waiver of Rights for both matters." K.M.G.'s written, voluntary acknowledgement of his rights and his admission, presented to the Youth Court during the disposition hearing, that he was admitting to the probation violations alleged in the Petition to Revoke, are sufficient bases for an admission in this case, and properly considered by the Youth Court.

¶52   Affirmed.

/S/ JIM RICE

We concur:

/S/ PATRICIA O. COTTER
/S/ MICHAEL E WHEAT
/S/ W. WILLIAM LEAPHART

21

Justice James C. Nelson, dissenting.

¶53  I dissent.

¶54  As noted, § 41-5-1513(1)(b), MCA (2007), provides that:

> The court *may not* place a youth adjudicated to be a delinquent youth in a state youth correctional facility for an act that would be a misdemeanor if committed by an adult *unless*:
>
> .   .   .
>
>         (ii) a psychiatrist or a psychologist licensed by the state or a licensed clinical professional counselor or a licensed clinical social worker has evaluated the youth and recommends placement in a state youth correctional facility . . . . [Emphases added.]

In this case, the use of the phrase *may not* is mandatory. *Van Der Hule v. Mukasey*, 2009 MT 20, ¶ 11, 349 Mont. 88, 217 P.3d 1019 ("[C]ourts that have construed legislative use of the phrase 'may not' have consistently held that the phrase is mandatory."). In other words, under the plain language of the statute, the youth court had no authority to place K.M.G. in a state youth correctional facility for the commission of a misdemeanor absent compliance with § 41-5-1513(1)(b)(ii), MCA.

¶55  It is undisputed here that Eileen C. Robbins was not "a psychiatrist or a psychologist licensed by the state or a licensed clinical professional counselor or a licensed clinical social worker."[1]  Hence, it follows that the plain and unambiguous statutory preconditions were not met in order to place K.M.G. in Pine Hills. In short, the court's sentence was illegal because the court exceeded its statutory authority to sentence. *Pena v. State*, 2004 MT 293, ¶ 24, 323 Mont. 347, 100 P.3d 154 (A district court "has no

---

[1] It is also undisputed that she did not make an unqualified recommendation that K.M.G. be placed at Pine Hills.

power to impose a sentence in the absence of specific statutory authority," its authority to impose sentences in criminal cases "is defined and constrained by statute," and a sentence that exceeds statutory authority or parameters is, therefore, "illegal." (internal quotation marks omitted)), *overruled on other grounds*, *Davis v. State*, 2008 MT 226, ¶ 23, 344 Mont. 300, 187 P.3d 654.

¶56　The court's sentence being an illegal sentence, the *Lenihan* exception applies and we may review the sentence even in the absence of an objection by the defendant—or, in this case, the youth. *State v. Lenihan*, 184 Mont. 338, 343, 602 P.2d 997, 1000 (1979); *State v. Kotwicki*, 2007 MT 17, ¶ 8, 335 Mont. 344, 151 P.3d 892. The youth, therefore, did not waive objection to the sentence.

¶57　As for the Court's reliance on *State v. Micklon*, 2003 MT 45, 314 Mont. 291, 65 P.3d 559, for the proposition that " '[a]cquiescence in error takes away the right of objecting to it' " (Opinion ¶ 40), I have and will continue to dissent from the use of the *Micklon* line of cases. *See State v. Clark*, 2008 MT 391, ¶ 45, 347 Mont. 113, 197 P.3d 977 (Nelson, J., specially concurring). This doctrine is more about soothing the hurt feelings of sentencing courts—whose own seeming inability or refusal to follow the law is the cause of the problem in the first place—than it is about following the law, requiring sentencing courts to follow the law, and doing justice for the defendant (youth).

¶58　More to the point, the sentence at issue here is illegal because it is not statutorily authorized. As pointed out above, the statute clearly and unambiguously provides that the court "may not" (i.e., lacks authority to) place a youth in a state youth correctional facility for commission of a misdemeanor unless "a psychiatrist or a psychologist

licensed by the state or a licensed clinical professional counselor or a licensed clinical social worker has evaluated the youth and recommends placement in a state youth correctional facility." Section 41-5-1513(1)(b)(ii), MCA. It is undisputed that this blackletter requirement of the law was not followed. Thus, absent compliance with the law, the District Court did not have authority—judicial power—to place K.M.G. in a state youth correctional facility.

¶59 Ignoring this, however, our decision here takes our *Lenihan* jurisprudence from the sublime to the ridiculous. Now, if the defendant "embraces" (Opinion, ¶ 40) the trial court's refusal to follow the law—i.e., the illegality—then we pass the sentencing court's dereliction with a wink and a nod. Our rationale is that we prevent the defendant from "gaming" the system.

¶60 The point missed in this silliness, though, is that if the District Court—which, theoretically, is in the business of making sure the law is followed[2]—would simply do its job in the first instance, and enforce the law as written, then any "gamesmanship" would be nipped in the bud. Every criminal "embraces" the illegality of his conduct; and every defendant,[3] if given a chance, will attempt to "game" the system to his or her advantage.

---

[2] There was a time when this Court recognized this principle. *See State ex rel. Bennett v. Bonner*, 123 Mont. 414, 425, 214 P.2d 747, 753 (1950) ("Judicial power as contra-distinguished from the power of the law has no existence. . . . *The law* precedes the courts. *The law* governs the courts. Thus it is the function of the courts to expound and administer *law* in those causes properly brought before them in course of legal procedure. . . . [Judicial power] is always exercised for the purpose of giving effect to the will of the people as that will is expressed in *the law*."). "Blind justice" is not supposed to mean that trial judges wear blinders to the laws that control their authority to act.

[3] And prosecutor.

24

Trial courts and this Court should, however, be something more than co-conspirators in that effort.

¶61    Indeed, when confronted with a situation in which not only the defendant, but also the prosecutor and the trial court, decided to "game" the system—where the prosecutor actually stated on the record, "We don't hold firm to the technicalities of the statute or the Supreme Court rulings"—this Court responded:

> The laws of the State of Montana are written to ensure that justice is served and the well-being of society and individuals is safe-guarded. Contrary to the County Attorney's pronouncement to the District Court that "we don't hold firm to the technicalities of the statute or the Supreme Court rulings," adherence to the legislative enactments and the decisions of this Court is not a matter of convenience or prosecutorial preference [or, for that matter, the preference of the defendant or the trial court]. No court or officer of the court has the prerogative of circumventing or modifying the procedures established by law.

*State v. Evert*, 2004 MT 178, ¶¶ 6, 19, 322 Mont. 105, 93 P.3d 1254.

¶62    The Court's contrary approach in the present case is a reprehensible approach to appellate review, and I categorically reject it.

¶63    I dissent.

/S/ JAMES C. NELSON